William **CAULFIELD, President Community School Board No. 26 et al., Plaintiffs,**

v.

The **BOARD OF EDUCATION OF the CITY OF NEW YORK et al., Defendants.**

**Nos. 77–C–2155, 77–C–2278 and 77–C–2531.**

United States District Court, E. D. New York.

March 15, 1978.

---

1204

Morris Weissberg, New York City, for plaintiffs.

Leonard Greenwald, Gretchen White Oberman, New York City, for intervenors-plaintiffs CSA, et al.

James R. Sandner, New York City, Thomas C. Greble, Glen Cove, for intervenors-plaintiffs Albert Shanker, et al.

Doran Gopstein, New York City, for defendant Bd. of Ed., et al.

James I. Meyerson, New York City, for intervenors-defendants Coalition of Black Educators, et al.

Kenneth Pawson, Albany, N. Y., for defendant State Commissioner of Education.

Arthur N. Eisenberg, New York Civil Liberties Union, Carol L. Ziegler, Public Ed. Ass'n, E. Richard Larson, American Civil Liberties Union, New York City, for defendant-intervenor Ross.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Richard Caro, Asst. U. S. Atty., Brooklyn, N. Y., for Dept. of HEW.

Nathan Z. Dershowitz, New York City, American Jewish Congress, amicus curiae.

Jeffrey P. Sinensky, New York City, Anti-Defamation League of B'nai B'rith, amicus curiae.

Major Davis Jr., Arverne, N. Y., amicus curiae.

## MEMORANDUM AND ORDER

WEINSTEIN, District Judge.

### INTRODUCTION

Plaintiff teachers, supervisors and administrators, in two related cases (77–C–2155, 77–C–2278), challenge a September 7, 1977, "Memorandum of Understanding" (Agreement) entered into by the New York City Board of Education and the Office of Civil Rights (OCR) of the United States Department of Health, Education and Welfare

(HEW) that requires the assignment of teachers on the basis of race. The Memorandum is set out in the Appendix. Alleging violations of Title VI of the 1964 Civil Rights Act (42 U.S.C. §§ 2000d and 2000d–2) and the Fifth and Fourteenth Amendments, plaintiffs seek a declaratory judgment voiding the September 7, 1977 Agreement, injunctive relief, and summary judgment.

HEW, the New York City Board of Education, and the intervenor defendants (as well as plaintiffs in related case 77–C–2531) defend on the ground that Title VI of the 1964 Civil Rights Act empowers them to reach such an accord and that the Memorandum of Understanding protects, rather than violates, the constitutional rights of New York City residents. They contend that the regulations of HEW have been fully complied with.

All parties prefer that this court forthwith declare the Agreement valid or invalid. They concur that there are important statutory and constitutional rights at issue. One side asserts that what is at stake is the right of individual teachers to have their assignments made without respect to race. The other side, save for the Board of Education, insists that New York City maintains an illegally segregated system of teacher assignments and that desegregation requires placement by race to eliminate racial concentrations. To be sure these are substantial substantive questions.

But there is a preliminary matter of transcendent importance. That is the issue of due process and the right to a hearing before important administrative action affecting the rights of individuals and institutions is taken. The huge power concentrations in the bureaucracies of our governments must not be permitted to be exercised secretly and arbitrarily. No matter how benign and well intentioned, those government officials who can, in practical effect, turn on or off the source of hundreds of millions of dollars, must conduct themselves with scrupulous regard for procedural protections. Not only must the result be just, but, if the people are to retain their faith in their government, the means used to achieve the result must be fair. See Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267, 1279–80 (1975).

Respect for the effective administration of government requires that before we address the substantive issue we permit the executive branch, through its appropriate administrative agency, to rectify any procedural error by granting a proper hearing. The reason is clear. Upon hearing the parties, modification may result that will vitiate the need for further litigation. It is obviously more desirable that those with presumed expertise, who are charged with the administration of federal funding programs, rather than the courts, make administrative decisions wherever possible.

The fact that the parties wish to sidestep the procedural question is not binding on the court. Cf. *Reid v. Board of Education of New York*, 453 F.2d 238, 242 n. 7 (2d Cir. 1971). Federal judges are not automatons, slot machines, who return the judgment selected if the parties agree on which button they would push. Once the jurisdiction of the court is invoked, the court has an obligation to decide in accordance with the law, even if the result satisfies none of the parties. *Rentways, Inc. v. O'Neill Milk & Cream Co.*, 308 N.Y. 342, 349, 126 N.E.2d 271 (1955) (Fuld, J.). As Mr. Justice Frankfurter remarked in another context:

> A trial is not a game of blind man's buff; and the trial judge—particularly in a case where he himself is the trier of the facts upon which he is to pronounce the law—need not blindfold himself . . . .

*Johnson v. United States*, 333 U.S. 46, 54, 68 S.Ct. 391, 395, 92 L.Ed. 468 (1948) (dissenting).

■ We find that the defendants have failed to comply with the procedural requirements of Title VI. Although the "Memorandum of Understanding" does not call for the termination of funds, it conditions further funding on the achievement of results that will require sweeping changes in the city school system. Title VI mandates that drastic governmental action of this nature that affects the lives of hun-

dreds of thousands of citizens cannot result solely from secret, informal negotiations conducted exclusively by a handful of government officials. HEW regulations must provide for some form of public participation in such critical decisionmaking by those whose rights are directly affected.

Accordingly, we vacate the September 7, 1977 Memorandum of Understanding and remand to HEW so that it can formulate and implement appropriate procedures. *See, e. g., Addison v. Holly Hill Fruit Producers*, 322 U.S. 607, 619–21, 64 S.Ct. 1215, 1222–23, 88 L.Ed. 1488 (1944); *Douglas v. Hampton*, 512 F.2d 976, 988–89 (D.C. Cir. 1975). To avoid disruption of the school system, the status of those already assigned under the Agreement will be maintained. Until this matter is resolved all assignments after April 7, 1978, will be made as if the Agreement had never become effective.

In view of this holding, we decline at this juncture to rule on the constitutionality of the Memorandum of Understanding. Such a ruling would be premature since the terms of the Agreement may well be altered when, as Title VI requires, the views of the non-negotiating parties and the public are considered.

## I. PROCEEDINGS BEFORE THIS COURT

### A. *Parties*

This suit was brought originally by six community school boards (1, 18, 20, 25, 26, and 29), individual principals and teachers against HEW and the Board of Education. Intervention as plaintiffs was granted to the United Federation of Teachers (UFT) and two teachers in the New York City school system; the Council of Supervisors and Administrators of the City of New York, Local 1, SASOC, AFL–CIO (CSA), plaintiffs in the related case of *Zuckerman v. Aiello*, 77–C–2278; and Community School Boards 11, 21 and 24. Also granted were motions to intervene as defendants by the Coalition of Concerned Black Educators, an unincorporated association, and four Black teachers, three of whom were rein-

stated and assigned in September 1977 pursuant to the September 7, 1977 Memorandum of Understanding; and Ronald Ross, a Black teacher in the New York City public school system, who was a co-complainant in an administrative complaint filed with OCR on or about February 17, 1976 alleging various discriminatory practices by the New York City Board of Education. Participating as friends of the court have been the American Jewish Congress, the Anti-Defamation League of B'nai B'rith and Major Davis, the former two aligned generally with the plaintiffs, and the latter with the defendants.

### B. *Related Ethnic Census Dispute*

On December 6, 1977, after hearing argument, the court denied the plaintiffs' motion for a temporary restraining order to enjoin the collection of data for the civil rights survey or census being undertaken by the defendant Board of Education on behalf of itself, the State of New York and the federal government. Plaintiffs then sought a preliminary injunction to bar the collection of ethnic data. After further argument on February 23, 1978, this relief was denied. Defendants were stayed for two weeks from placing into their computers any data or information being obtained from plaintiffs from such a survey or census, pending the filing of a notice of appeal and a motion with the Court of Appeals to extend the stay. Subsequent motions to reconsider the court's determination were rejected. There is a clear right and obligation of authorities to gather data in order to determine whether there has been unlawful discrimination. *See United States v. Board of Education et al.* (E.D.N.Y. 76–C–861) (Order of July 15, 1976), *appeal dismissed as moot*, 543 F.2d 1 (2d Cir. 1976).

### C. *Hearing on Due Process—Title VI Issue*

On February 23, 1978, the parties were requested to assist the court in deciding whether rights to constitutional and statutory due process were abridged by the failure to afford interested persons an opportu-

nity to participate in the administrative proceedings that resulted in the Memorandum of Understanding. A hearing on this question was held on March 7, 1978.

At that hearing the parties were afforded an opportunity for full argument and submission of any relevant evidence. The Board of Education offered various documents and supplemented its submission by letter. Other parties relied upon the uncontested documents already on file in this court and subsequent affidavits.

The court's March 7, 1978 decision on the threshold procedural question obviated the need to decide other issues. Accordingly, all motions for summary judgment or injunctive relief were mooted pending a further determination by HEW.

## II. FACTS

The September 7, 1977 Memorandum of Understanding culminated a year old dispute between HEW and the New York City Board of Education. The controversy has spawned a complicated legal tangle, including one other major law suit, *Board of Education of the City School District of the City of New York, et al. v. Califano, et al.,* 77–C–1928, decided by this court on November 18, 1977. In that case, the Board of Education sued HEW, claiming that HEW had illegally cut-off some $17.5 million—subsequently reduced to $3.8 million—of Emergency School Aid Act (ESAA) funding, 20 U.S.C. §§ 1601 et seq., needed by the city to help integrate its schools. After extensive hearings, we determined that HEW had failed to adhere to constitutionally mandated procedure and statutory standards and remanded the case to HEW for further consideration.

In this case, HEW and the Board of Education are positioned not as adversaries, but as co-defendants, united in opposition against the claims of a substantial number of the teachers, supervisors and administrators of the New York City school system. In spite of the shifting alignments of the parties, the facts of the two law suits are, as might be expected, intimately related.

### A. *Chronological History*

#### 1. *November 9, 1976—OCR's Letter to Chancellor Anker*

The immediate source of this litigation dates to a November 9, 1976 letter sent by OCR to Chancellor Irving Anker, operating head of New York City's school system. Based on an investigation of civil rights compliance in New York City under Title VI of the 1964 Civil Rights Act and Title IX of the Education Amendments of 1972, it specified areas of alleged noncompliance with the provisions of both statutes.

Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) provides that no person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity receiving federal financial assistance. Title IX of the Educational Amendments of 1972 similarly prohibits discrimination in federally assisted programs on grounds of sex. 20 U.S.C. § 1681. Each federal department and agency is charged with assuring compliance with these provisions in the programs and activities under its jurisdiction and with terminating or withholding federal funding to programs found not in compliance. 42 U.S.C. § 2000d–1. In addition to requiring initial assurances of nondiscrimination in every application for federal assistance made to it, each federal department is required to conduct periodic compliance reviews and to investigate and resolve individual or class complaints of discrimination arising under the federally assisted programs which it supervises. *See* 45 C.F.R. §§ 80.1–80.13.

HEW supervises various programs of federal aid to the New York City schools. The November 9, 1976 letter to Chancellor Anker focused only on the "employment phase" of HEW's compliance review of the New York City school system. It charged that the City had, in violation of Title VI, on the basis of race and national origin:

 (1) denied minority teachers full access to employment opportunity through the

use of racially discriminatory selection and testing procedures and through the use of racially identifiable employment pools in a manner that discriminatorily restricts the placement of minority teachers;

(2) assigned teachers, assistant principals and principals in a manner that has created, confirmed and reinforced the racial and/or ethnic identifiability of the system's schools; and

(3) assigned teachers with less experience, lower average salaries and fewer advanced degrees to schools which have higher percentages of minority students.

It also charged that, in violation of Title IX, the City had, on the basis of sex:

(1) denied females equal access to positions as principals and assistant principals throughout the system;

(2) provided a lower level of financial support for female athletic coaching programs; and

(3) deprived female teachers of seniority rights and other compensation through failure to eliminate the effects of past discriminatory leave policies.

The letter ordered the City to submit a plan within 90 days which "will remedy the discrimination and provide corrective action where individual cases of discrimination are identified." It noted: "Our goal is to end discrimination not to cut off federal funds."

After receipt of the November 9, 1976 letter, Chancellor Anker asked Bernard Gifford, Deputy Chancellor of the Board, to serve as chairman of an internal Board of Education committee to review and evaluate the specific allegations of discrimination made by OCR. During his review of the employment practices within the New York City school system, Mr. Gifford consulted with, and received information from, persons both within and without the school system. The organizations consulted included the American Jewish Congress, the UFT, the Council of Supervisors and Administrators, the NAACP, ASPIRA of New York, and the New York Civil Liberties Union. See pp. iii–iv of the Gifford Report entitled "Race, Ethnicity, and Equal Employment Opportunity: An Investigation of Access to Employment and Assignment of Professional Personnel in New York City's Public Schools" (June 1977). According to intervenor-defendant Ross, the Gifford Report confirmed OCR's charges and provided the impetus for the Board of Education to enter into the Memorandum of Understanding in early September. See Memorandum of Law in Support of Defendant-Intervenor Ross' Motion to Amend Order of February 24, 1978 and in Opposition to the Entry of Summary Judgment with Respect to the Procedural Due Process Issues Raised by the Court Sua Sponte, Court Exhibit 7 at March 7, 1978 hearing, at p. 12.

OCR first rejected a voluntary compliance plan submitted by the Board of Education in April 1977. Id. at p. 8. Further negotiations in July and August resulted in the September Memorandum. Id. at p. 12.

During the period of November 9, 1976 to September 7, 1977, OCR received comments, communications and inquiries respecting its November 9, 1976 letter from not only the Central Board and its Chancellor, but also from various organizations, public officials, teachers, principals, and other people. There were also meetings and conferences in both Washington, D.C. and in New York between representatives of OCR, the Central and Local School Boards, parents, teachers, and other citizens and groups concerning these and related matters. See Memorandum of Law in Opposition to Court's Sua Sponte Suggestion for Remand, U.S. Attorney, Eastern District of New York, Court Exhibit 6 at March 7, 1978 hearing, at p. 4; affidavit of Ira Glasser of March 13, 1978 at p. 2.

2. *January 1977—The ESAA Applications*

Two months after receiving OCR's letter, in January, 1977, the Central Board along with various Local Boards submitted applications for ESAA funding to the Secretary of HEW. The applications sought money for basic, pilot and bilingual programs in

the public schools of the City of New York for the 1977–78 school year in Districts 1, 7, 9, 11, 12, 13, 16, 17, 18, 20, 21, 22, 25, 26, 28, 30 and 32 and in the high schools and special educational programs administered by the Central Board. The funds were to provide services for an estimated 40,000 students. On April 14, 1977, the Board, as instructed by the HEW staff, submitted a revised application to HEW Secretary Califano. HEW officials then informed the Board that the educational programs described in the April, 1977 ESAA applications met all HEW programmatic and fiscal requirements and that the applications were approved as to content and amount, subject only to a determination that no other legal impediments to funding existed. At this time ESAA funds of approximately $17.5 million were tentatively approved and set aside by HEW for these programs.

3. *April 1977—The Board of Education's Response to the November 9, 1976 OCR Letter*

On April 22, 1977, the Central Board, on behalf of itself and the Local Boards, issued a report denying the existence of any discriminatory practices in the New York City public school system. The report contained supporting data purporting to rebut the conclusions of OCR.

4. *July 1977—ESAA Funding Denied*

In early July, 1977, the applicant school boards received a letter from Herman R. Goldberg, Associate Commissioner of HEW's Equal Educational Opportunity Programs. Dr. Goldberg makes preliminary determinations of eligibility for ESAA funding. The letter, dated July 1, 1977, advised the school boards that ESAA funding would be denied to New York City for the 1977–78 school term. HEW based its decision upon conclusions stated in the November 9, 1976 OCR report.

Subsequently, HEW advised the applicant school boards that ESAA funds would be denied solely on the ground of discrimination in assignment of teachers in the public schools. *See* Dr. Goldberg's letter of

September 19, 1977. OCR statistics allegedly reflected a low system-wide minority hiring rate in New York City public schools. The statistics also showed a strong correlation between minority teachers and minority students.

A compromise at the administrative level resulted in ESAA funds being allocated to all the local districts but District 11. The approved local districts had agreed to reassign their teachers to eliminate racial disparities in teacher census in the schools within each district. HEW then agreed that some $14 million would be paid to the various acquiescent local school boards. This agreement reduced the amount of funds in dispute from $17.5 million to $3.8 million, a sum HEW continued to withhold from the Central Board and Local Board 11.

Commissioner Goldberg's July 1, 1977 letter of denial also advised the school boards that, pursuant to section 185.46 of title 45 of the Code of Federal Regulations, they had an opportunity to show cause before him why the determinations of ineligibility should be revoked. The school boards requested and were granted such an opportunity. On July 20, 1977, a show cause hearing was held for Local Board 11. The Central Board's hearing was held on July 22, 1977. On July 26, 1977, Local Board 11 submitted supplementary materials as did the Central Board on August 10, 1977.

5. *Mid-September 1977—Final Denial of ESAA Funding*

About one week after the Board and HEW entered into the Memorandum of Understanding, HEW Commissioner Goldberg informed Local Board 11 and the Central Board that the summer show cause hearings had not caused HEW to reconsider its denial of ESAA funding. *See* letter dated September 15, 1977 from Commissioner Goldberg to Local Board 11's Superintendent Nicholas Cicchetti and letter dated September 16, 1977 from Commissioner Goldberg to Chancellor Irving Anker. The school boards then submitted evidence to HEW in support of requests for waivers of ineligibility pursuant to 20 U.S.C.

§ 1605(d)(5) and 45 C.F.R. § 185.43(d), but to no avail. Chancellor Anker, in an October 28, 1977 affidavit (p. 15), noted that the Board had already been "advised informally by defendants Goldberg and Tatel that waivers of ineligibility will not be granted to plaintiffs unless the remedy for eligibility is effectuated immediately, that is, a quota of teacher assignments is adopted and implemented by plaintiffs."

### 6. *November 18, 1977—Remand to Reconsider ESAA Funding*

After an extensive review of the administrative proceedings in the ESAA case, this court concluded that although show cause hearings were held, plaintiffs were effectively granted a sham hearing at which the evidence they submitted was not considered. The court rejected HEW's position that the evidence submitted was irrelevant because even if it were true, it could not change the result. *See Board of Education of the City School District of the City of New York v. Califano,* 77–C–1928, at p. 14 (November 18, 1977). The court, accordingly, remanded the case to HEW so that the plaintiff school boards would be given a "meaningful opportunity to rebut the statistical case of discrimination." *Id.* at 55.

### 7. *September 7, 1977—HEW and City Board of Education Enter Into Memorandum Of Understanding*

On September 7, 1977, HEW and the City Board of Education entered into the Memorandum of Understanding challenged in this law suit. The Agreement calls for the implementation of a three year plan to eliminate alleged discrimination in the selection or assignment of teachers and supervisors in the public schools. The terms, which HEW accepts as compliance with both Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972, include the following:

1. Not later than September of 1979, the teacher corps of each District in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

2. Not later than September of 1980, each individual school in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

3. The Board of Education will demonstrate to the Office for Civil Rights, subject to prescribed review, that any failure to meet the commitments set forth in paragraphs one and two hereof results from genuine requirements of a valid educational program. In addition, the Board will demonstrate that it has made and is continuing to make special efforts to overcome the effects of educationally-based program exceptions through effective use of such mechanisms as recertification, recruitment and special assignment of teachers.

 . . . . .

6. The Board agrees, as soon as practicable to have performed a study of the relevant qualified labor pool by race, ethnicity, and sex by an independent expert acceptable to the parties and pursuant to methodology and standards agreed to by the parties. Through the adoption and implementation of the affirmative action procedures and legislation provided in paragraph 4 of this Memorandum and other efforts taken or to be taken by the Board, the Board commits that by September of 1980, the levels of minority participation in the teaching and supervisory service will be within a range representative of the racial and ethnic composition of the relevant qualified labor pool.

(The full memorandum is set out in the Appendix.)

The Board further agreed to actively sponsor and support state legislation at the 1978 session of the Legislature to help ac-

complish these goals, including the abolition of the rank ordering of persons who had passed examinations (Paragraph 4c of the Memorandum), the combination of all eligibility lists by license, and the merger of such lists with the names of those who have passed any new tests without regard to the dates of examination. Paragraph 4b. In a special addendum to the entire Memorandum, the UFT also committed itself to support the adoption of such legislation. Should such legislation not be adopted, the Board is bound to undertake litigation to achieve the agreed objectives. Paragraph 5.

Although the UFT was consulted with respect to the specific terms of the September 7, 1977 Agreement before it was adopted, other parties to the present litigation were not. The public and other interested parties were presented with an accomplished fact. No publication of the proposed Agreement was made in advance of its adoption and no hearings were held by HEW on its specific terms.

HEW's extensive discussions with interested groups dealt with the general problem of alleged discrimination in the City's schools, not with the specific terms of the proposed Agreement. For instance, in February 1976, The Coalition of Concerned Black Educators, Maria Banks, Kenneth Johnson and Dolores Ward, all of whom have intervened as defendants, filed an administrative complaint with HEW alleging racial discrimination in the employment policies and practices of the City School District of the City of New York. This administrative complaint allegedly resulted in, or at least contributed to, the decision of OCR to launch a full-scale investigation of the City school system which, in turn, prompted OCR to send its November 9, 1976 letter to Chancellor Anker charging the City with non-compliance with Title VI and Title IX. In spite of their important roles, first as catalysts, and later as interested parties directly affected by any consent settlement, none of these intervenors were consulted by HEW or the Board of Education on the terms of the Agreement at any time prior to its promulgation. *See* Notice of Motion to Intervene at paragraph 22; March 7, 1978 Letter to Court from James Meyerson, Court Exhibit 5 at March 7, 1978 hearing. Had they been consulted, they would have urged that the Agreement include "substantially more definitive hiring goals the net effect of which hopefully would have resulted in significantly greater minority employment on an integrated assignment basis within the City School District of the City of New York." Intervenor-Defendants Responsive Pleading at p. 10.

Nor did HEW or the Board of Education consult Ronald Ross, who has also intervened as a party defendant. He, too, had filed an administrative complaint with OCR in February 1976. Ross asserts that his interests in enforcing the September 7, 1977 agreement may not be identical with either HEW or the City Board of Education. *See* Affidavit in Support of Motion to Intervene of Arthur N. Eisenberg at paragraph 11. Intervenor-plaintiff, the Council of Supervisors and Administrators, was also not consulted in spite of the allegedly "clear impact that such Memorandum of Understanding was intended to have upon the seniority rights of CSA members guaranteed by the applicable collective bargaining agreement between CSA and Defendant Board of Education and the civil service rights of those employees under the New York State Constitution and Education Law." Intervenor's Complaint at p. 19.

A limited post-Agreement opportunity for expressing views was afforded on October 19, 1977 by the Board of Education—not by HEW as required by Title VI. This "hearing" took place almost six weeks after the Memorandum became effective. In its calendars of October 5, 1977 (March 7, 1978 hearing—Defendant's Exhibit A) and October 19, 1978 (March 7, 1978 hearing—Defendant's Exhibit B) the Board printed the text of the September 7, 1977 Memorandum of Understanding, noting that it would be presented for adoption at its regularly scheduled meeting on the night of October 19, 1977. The calendars stated that the Memorandum was printed "for information only." At the October 19, 1977 meeting,

the Board heard some 10 statements by various members of the New York City community, including Mr. Jack Zuckerman, the President of CSA. *See* list of speakers (Defendant's Exhibit C) at March 7, 1978 hearing. These persons, as well as some others, were evidently notified of the Board ·meeting by mail, although none were sent a copy of the Memorandum. *See* Transcript of March 7, 1978 hearing, Statement of Gretchen White Oberman, counsel for CSA.

By the time of the Board of Education hearing on the Agreement, many teachers had already been assigned in accordance with its terms. *See* Letter of Corporation Counsel of the City of New York, March 13, 1978; Goldman, Assignments of New Teachers by Race are Continuing Amid Controversy, New York Times, Jan. 6, 1978, at B 14, cols. 1–8. It is apparent that the Board of Education was irrevocably committed to adoption of the Agreement without modification before it held its hearing.

Plaintiffs allege that pursuant to this Agreement, beginning in September 1977, the Board of Education rehired laid-off teachers from preferred lists and assigned them to work in particular Community School Districts and schools solely on the basis of their race and color. They claim that partly as a result only 2,360 of 9,000 laid-off teachers accepted such re-hiring and assignment and 800 of the 2,360 re-hired teachers subsequently resigned. *See* Plaintiff's Statement Under Rule 9(g) paragraph 5 (Jan. 18, 1978). Plaintiffs further allege that "mass transfers of thousands of teachers will have to be made in the school year beginning in September, 1978, in order to comply with the Board's agreement of September 7, 1977 with OCR." *Id.* paragraph 8.

It is disingenuous to suggest, as do the defendants, that the general discussions about discrimination in the City school system between November 9, 1976 and September 7, 1977 obviated the need for a hearing on the particular terms of the Agreement. In point of fact, announcement of the Agreement came as a surprise to all those indirectly involved as well as the public, save for the small coterie who actually participated in negotiating its terms. No one has ever denied that serious racial problems exist in the schools of the City of New York. The issue was—and is—what specific remedies are to be adopted. On this dispositive point of judgment and power there never was an opportunity for public participation of the kind minimally required. *Compare* the models set out at Part III A 6, *infra*. We cannot ignore what every person involved in negotiations—labor, commercial or political—knows: it is the "details," the precise "drafting," not global principles, that are usually the bones of contention.

### 8. *The Present Controversy*

Those challenging the HEW-Board of Education September 7, 1977 Memorandum of Understanding take much the same position that the Board of Education took as plaintiff in the ESAA case. They maintain that statistics alone do not make out a conclusive case of racial discrimination, and that the New York City statistics can be successfully rebutted by a variety of racially neutral factors beyond the control of the school board. In light of this, they contend that the Board of Education's consent to the onerous terms of the Agreement was totally unwarranted.

Plaintiffs charge that the only reason Board officials abandoned the position they so vigorously asserted in the ESAA suit is that the federal government coerced them to sign the Memorandum of Understanding by tacitly threatening the withdrawal of some quarter billion dollars of critically needed federal funding. The ESAA fund cut-off, plaintiffs say, is proof of the federal government's muscle and resolve.

### B. *Minority Concentrations*

Before discussing plaintiffs' charges of coercion and questions of non-compliance under Title VI, it is helpful to review some of the evidence and arguments made in the ESAA litigation. We do this to demonstrate the difficulty of the factual and legal issues and the need for some kind of hear-

ing at which knowledgeable and interested persons can provide valuable assistance in developing specific plans to eliminate discrimination.

### 1. Statistics On Racial Disparity

The statistical data lend support to HEW's finding that there was a pattern of assigning teachers in a way that would tend to directly relate the race of the teacher with the predominant race of the students in the school. There is a direct correlation between the numbers of minority teachers and the percentage of minority students in the City's schools when the schools are broken down into groups of low, medium and high minority school population.

Set out below is a graph illustrating this relationship at the high school level for the school year 1975–76. The Central Board and not the Local Boards controls high schools.

ASSIGNMENT OF MINORITY PROFESSIONAL STAFF

NEW YORK CITY 1975-1976

HIGH SCHOOLS (CITY-WIDE)

An example of the statistical pattern at the elementary school level is set out below for the prior school year, 1974–1975.

DISTRIBUTION OF TEACHER POPULATION BY MINORITY AND NON-MINORITY GROUP
MEMBERSHIP AND DEGREE OF SCHOOL INTEGRATION
ALL ELEMENTARY SCHOOLS: 1974-1975

| PERCENT MINORITY PUPILS PER SCHOOL | SCHOOLS | | TOTAL TEACHERS | | NON-MINORITY TEACHERS | | MINORITY TEACHERS | |
|---|---|---|---|---|---|---|---|---|
| | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT | NUMBER | PERCENT |
| 0 - 9.9 | 49 | 7.9% | 1,595 | 6.0 | 1,576 | 6.9% | 19 | 0.5% |
| 10 - 24.9 | 83 | 13.4 | 2,787 | 10.5 | 2,751 | 12.0 | 36 | 1.0 |
| 25 - 49.9 | 103 | 16.6 | 3,552 | 13.4 | 3,439 | 15.0 | 113 | 3.2 |
| 50 - 74.9 | 62 | 10.0 | 2,741 | 10.4 | 2,522 | 11.0 | 219 | 6.3 |
| 75 - 89.9 | 51 | 8.2 | 2,481 | 9.4 | 2,195 | 9.6 | 286 | 8.2 |
| 90 + | 271 | 43.9 | 13,295 | 50.3 | 10,474 | 45.5 | 2,821 | 20.8 |
| TOTAL | 619 | 100.0 | 26,451 | 100.0 | 22,957 | 100.0 | 3,494 | 100.0 |

The disparity in ratios in 1977–78 has apparently not been appreciably reduced despite perturbations of major teacher layoffs resulting from the City's fiscal crisis. Moreover, the percentage of minority teachers in the New York City school system is in the order of one-half to one-third that in comparable cities. In the 1974–75 academic year the percentages were: New York—13.2%, Los Angeles—31.1%, Chicago—43.2%, Philadelphia—40.2%, and Detroit—50.6%. Draft Memorandum of Law in Support of Defendant-Intervenor Ross' Opposition to Plaintiffs' Motion for Summary Judgment or for a Preliminary Injunction at p. 23, n. 17.

### 2. Explanations of Statistics

#### a. The High Schools

In his July 1, 1977 letter to Chancellor Anker denying ESAA funding to the Central Board, HEW Commissioner Goldberg attached a list of 39 high schools as having student teacher ethnicity levels which "possibly" indicate that these high schools are intended for students of a particular race, color or national origin. In an affidavit filed in the ESAA litigation, Chancellor Anker reviewed in considerable detail the status of teacher assignments in each of the 39 high schools cited by Commissioner Goldberg. "A school by school analysis of the list," Anker concluded, "such as was attempted to be made to defendant Goldberg at the show cause proceeding proves that such inference was entirely unfounded." See affidavit of October 28, 1977, at par. 21. The Central Board's school-by-school analysis of the history of these high schools provides evidence that there was neither intentional discrimination nor a pattern or practice of assigning teachers by race.

For example, the list includes Harlem, Park East, Harlem Prep, Lower East Side Prep, Satellite Academy, Pacific, Redirection and Auxiliary Services—all independent alternative high schools. They are mini-schools with student populations of 100; most high schools enroll between 1,200–3,000 students. Arguably, they should not properly be part of an analysis of staffing pattern in New York City high schools because the unique historical development of these schools, the exceptional methods of teacher selection, and their special educational programs and curriculum all preclude comparison with other high schools. The students in these schools have all dropped out of other schools. Because of various impediments to learning such as drug addiction, pregnancy, criminal records, or more generalized social maladjustment, these students require curriculum programs and counselling different in focus and concentration from that offered in other high schools. The schools themselves were originally private community schools. They have traditionally offered personalized guidance services, flexible curriculum and staggered teacher hours geared to the special needs of their students. For example, many of these schools operate into the evening hours. Teachers must be willing to work long and inconvenient hours. They must be motivated to develop contacts in the community, participate in family counselling and in general perform a myriad of duties which reflect a pervasive commitment to teaching children with special learning problems. Recognizing the degree of teacher commitment necessary to meet the challenge at these alternative schools, the Board relies solely upon voluntary applications in staffing them.

The high school staffing pattern reflects the academic subject matter or vocational courses offered at specific high schools. Generally the license areas with the fewest number of qualified and licensed teachers are mathematics, chemistry, physics, English and, most recently, Spanish and Hebrew. Eligible lists for these areas are completely exhausted and recertifications and even substitute licensed staff are recruited to fill such vacancies. For the bilingual areas, license examinations were developed only recently. On the other hand, some licensed areas traditionally have had greater numbers of licensed minority teachers than others. For example, the minority passing rate for an English high school

license was relatively high, 49.23% (1974) and for a Social Studies high school license, low, 7.69% (1974). There is a greater incidence of minority group members possessing pedagogical licenses in home economics, cosmetology, and nursing, than, for example, in mathematics, physics, or chemistry. Staffs also reflect teacher attrition rates and transfers. Schools with average teacher longevity of 10–15 years will more often be predominantly White than minority in teaching staff since the percentage of minority teachers with college degrees at that earlier period was even lower than the current 6% of all college graduates. The existence of these factors affecting distribution precludes, the Central Board argues, a random distribution of 8.3% of minority teachers in every high school.

Bushwick and Eastern District High Schools both have high concentrations of Hispanic children who are non-English dominant. These schools provide the *Aspira* consent decree program, Title VII bilingual programs and English as a Second Language Program. Of the 130 teachers at Eastern District, 16 are Hispanic. Even using H.E.W.'s mathematical method of determining discrimination, subtracting these 16 teachers from the 18.0% minority teachers at that school puts its staffing level near the 8.3% high school-wide minority teacher population. Similarly, of Bushwick High School's 146 teachers, 6 are Hispanic. Subtracting these teachers from the minority teacher percentage puts that school's minority teacher percentage within 5% of the 8.3% figure. The Central Board is required to provide the *Aspira* program to all eligible children and has consequently had to hire bilingual staff on an expedited basis. The educational justification for a resulting concentration of Hispanic teachers in schools with high percentages of Hispanic children seems clear.

August Martin High School succeeded Woodrow Wilson High School in Southeastern Queens and was, when opened in 1971, the only magnet thematic school in the City. The theory of a magnet school is that by developing a curriculum around an innovative educational theme students of all backgrounds will be attracted to attend the school. August Martin's location near John F. Kennedy International Airport made it an ideal site for such a magnet school emphasizing aerospace studies. Teachers generally were selected from eligible lists to fill staff positions at August Martin, but in instances where there were no licenses for specific aerospace subjects, recruitment of persons with the most related backgrounds was undertaken. For example, there is no license in flying instruction, but a common branches teacher with flight instruction service was hired and 150 students fly planes as part of the program. Similar selections were made for avionics, radio communication and other courses for which there are no specific licenses. The school, which is located in a largely Black middle class area, has a high attendance rate of 91%, and 90% of its students go on to college. It has a work-study cycle at Kennedy Airport providing jobs in airplane maintenance, repair and airline clerical and reception work. It has six Title I teachers all of whom are monitored by Title I compliance teams. Many of the minority teachers have been part of the school staff since the time it was Wilson High School. In assigning teachers to the innovative programs at this school the Board has not made determinations on the basis of race, but rather because teachers possessed specific licenses in the subject areas to be taught, or had relevant experience and comparable licenses.

It is apparent from this detailed analysis that, had the Central School Board attempted to achieve a City-wide minority teacher average in each of its high schools, the result might have been improvements in statistics but deterioration in educational programs. Although each school's situation is explicable, HEW, given its expertise, might still conclude that the overall City-wide pattern itself has not been sufficiently justified.

#### b. *Lack of Central Board Control*

The Board of Education contends that it is caught in a whirlpool of circumstances from which it cannot escape and that it has not intentionally discriminated. The factors it points to include State law, demographic changes in the student population of the City schools, collective bargaining agreements with neutral date-of-hire seniority practices, low minority incidence in the relevant available teacher work force, and the incidence and distribution of vacancies in specific teacher license areas.

#### (1) *State Law on Teacher Appointment*

All teacher appointments and assignments in New York City public schools until 1970 were made pursuant to the provisions of Education Law sections 2569 and 2573. Under that statutory scheme, the Board of Examiners conducted competitive examinations for pedagogical licenses and promulgated lists of candidates ranked in order of performance on the examinations; eligible lists were then certified for appointment and assignment of teachers in rank order.

The Education Law also permitted assignment of persons with substitute licenses where there were an insufficient number of regularly licensed teachers to fill vacancies. Eligible lists have never described or identified the national origin or race of candidates for pedagogical assignment.

While this statutory pattern continues to be applicable in the City's high schools, a new method for teacher appointment and assignment for the City's elementary, intermediate and junior high schools was created by the 1969 amendments to the Education Law. This change was designed, in part, to achieve affirmative action goals in minority teacher hiring. Effective September, 1969, the New York City school system was restructured into 32 decentralized Community School Districts. Subject to some powers retained by the Central Board and the Chancellor, the Districts were authorized to appoint and assign teachers. Educ.L. § 2590–e(2).

As part of the decentralization law, three alternative methods of teacher appointment and assignment were provided for schools within community school districts where the reading level is below the 45th percentile of reading scores for the local school district. Education Law § 2590–j(5). Appointments in such schools may be made from (1) eligible lists regardless of candidate ranking, (2) the National Teachers Examination, a qualifying (i. e., non-ranked) rather than a competitive examination, administered nationally by the Education Testing Service, or (3) lists resulting from qualifying examinations prepared and administered by the Board of Examiners. The last of these lists had the lowest ratios of minority teachers. Appointments to the top 55 percentile reading score districts were to be made from ranked lists containing relatively small numbers of minority teachers.

These amendments to the Education Law were enacted with the stated purposes of (1) equalizing reading achievement levels; (2) increasing the number of minority teachers employed in the New York public school system; (3) eliminating overutilization of substitute licensed teachers; and (4) encouraging local community solutions to educational problems. The technique used was in the nature of a political compromise that satisfied minority groups, which obtained more minority jobs in minority districts, without offending Whites, who could continue to choose teachers from predominantly White teacher lists purportedly chosen on a merit selection basis.

Revisions of the New York Education Law were based on a number of racial factors which could no longer be ignored. City public school student population had dramatically changed from predominantly non-minority to predominantly minority. The percentage of minority teachers—7% in 1969—though consonant with the percent-

age of minority individuals in the relevant available work force—5% of college graduates in the United States and the New York Metropolitan area—was relatively static and disproportionate to the continually increasing minority student population. Low reading achievement, particularly among minority students, fostered a developing educational consensus that minority teacher role-model theories should be explored, at least experimentally, in schools where low reading levels warranted new educational approaches. Minority teacher hire rates had increased in school districts where the National Teachers Examination and qualifying, rather than competitive examinations for teacher selection, had been utilized experimentally. An overdependence on substitute licenses was developing in various school districts, particularly those with high concentrations of minority students; this development was due in part to reluctance of some older teachers with tenure to teach in schools in areas with high minority populations where crime rates and violence were greater than in some other areas of the City. White teachers tended to live closer to schools with White student bodies while Black and Hispanic teachers tended to live closer to schools with high minority ratios; to the extent that convenience of teachers and their social and professional friendships entered into assignments, there was a tendency towards ethnic concentrations.

Teacher hiring during the period 1970–71 through 1974–75 indicated that the purpose of the amendments to the Education Law—increasing minority teachers—was substantially realized. For Blacks the percentage change was + 15.2%; for Hispanics it was + 112.6%. The overall percentage of minority teachers in the school system more than doubled from 7% in 1969 to 15% in 1976. In view of the tenure of older teachers, the contraction of the public school system under fiscal pressures, reductions in students due to a drop in birth rates, increases in private school enrollment, and loss of central city population, this change is reflective of a strong policy to increase the percentage of minority school teachers.

One predictable result of these statutory changes was that a disproportionate percentage of the new minority teachers were assigned to schools with disproportionately high minority school populations. The districts in the lowest 45 percentiles of reading scores were the districts with the highest minority populations. Local pressures of the minority populations to ignore the ranked lists in these districts meant that Black teachers found it easier to obtain jobs in these districts than in the White-controlled, White student districts.

An irony of this and the ESAA litigation is that among the circumstances that may serve to place in question federal funding is the more than twofold increase in minority teachers in the school system between 1969 and 1976. During the ESAA lawsuit, the federal government acknowledged that it had no desire to challenge the constitutionality of the 1969 amendments to New York's Education Law. It approves the resultant growth in the proportion of minority teachers but not their assignment to predominantly minority schools.

### (2) Demographic Changes

In 1957, the student population of the New York City School District was 68.3% non-minority; in 1975, 32.1% non-minority. (Despite its inappropriateness under present New York City conditions, we continue to use the term "minority" to refer to Blacks and Hispanics and "non-minority" with reference to Whites.) During the same period the non-minority population of New York City decreased by 702,699, while the minority population increased by 815,566. Non-minorities continued to leave the City in larger, and enter the City in smaller, percentages than minorities. The birth rate of the minority population has been substantially higher than that of others. Moreover,

the ratio of minority students to others in non-public schools remains relatively low and private school enrollment has continued to increase.

Housing patterns in virtually all boroughs of the City of New York reflect such large concentrations of minority and non-minority groups that zoning of school feeder patterns to achieve racial balance became increasingly difficult during the 1960's and 1970's. To improve racial balance, the Board devised various zoning strategies, such as choice of admissions, paired schools, and scrutiny of school site selection. It is apparent, nevertheless, that the schools have become more, rather than less, segregated and that this trend continues virtually unabated.

(3) *Contractual Provisions and Court Orders*

Teacher assignments reflect date-of-hire seniority under provisions of the collective bargaining agreement between the Board of Education and the United Federation of Teachers which provide that vacancies as they arise must be offered in the first instance to teachers with the greatest length of service. Under these contractual provisions, on May 15 of each school year, teachers have been able to request transfers to system-wide vacancies based upon system-wide seniority. As a matter of self-selection, teachers choose schools near their homes or schools they find more congenial. Ethnic concentrations result.

Vacancies in specific licenses must, where possible, be filled by licensed persons. Thus, the number of minority and non-minority persons possessing specific licenses and the number of vacancies in a particular license area determine the incidence and distribution of teachers in the school system. The result is ethnic concentrations based upon historical ethnic favoring of some fields more than others.

The consent decree in *Aspira of New York, Inc. v. Board of Education*, 72 Civ.

2004 (S.D.N.Y. August 29, 1974), requires the provision of bilingual instruction to Spanish-dominant children. This results in the concentration of Hispanic teachers in schools with high Hispanic student populations.

### III. LAW

#### A. *Title VI*

##### 1. *Compliance Procedures*

Compliance with Title VI may be effected in any of three fashions: fund cut-offs; any other means authorized by law; or voluntary means. The premise of the statutory scheme is that drastic governmental action such as fund termination entitles fund recipients to a variety of procedural protections, including a hearing.

The statute and regulations provide a hierarchy of remedies. A federal agency can only resort to fund termination after it has advised the grant recipients of a failure to comply with Title VI requirements and "has determined that compliance cannot be secured by voluntary means." The agency can then terminate or refuse to grant assistance to a recipient of federal funds, but only if two conditions are met. First, there must be an express finding on the record, after an opportunity for a hearing, of a failure to comply with Title VI. Second, the head of the federal department must file with the committees of the House and Senate having legislative jurisdiction over the program involved a full written report of the circumstances of, and the grounds for, the action. Thirty days must elapse after the filing of such a report before the termination becomes effective. 42 U.S.C. § 2000d–1 reads as follows:

Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d

of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

In the instant case, there was no fund cut-off. Allegations of noncompliance resulted in an agreement between HEW and the City school board, reached after informal negotiations between the parties. Only the United Federation of Teachers was consulted during these negotiations. None of the other plaintiffs or defendant-intervenors in this suit, nor any other parties, were notified or in any way involved, including those intervenors who had filed administrative complaints with HEW in 1976. Although the agreement did not call for the termination of funds, it did mandate sweeping conditions for fund continuation. As noted above, not later than September, 1980, each individual school in the New York City school system must reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally based program exceptions. To achieve this result, the City will have to reassign its teachers to schools on the basis of their race.

There can be little doubt that the HEW-School Board agreement is drastic governmental action that affects the lives of many New York City residents. It is equally clear that the Agreement does not fit neatly into any of the Title VI categories: it neither calls for a fund cut-off, nor is it "voluntary."

The regulations enacted pursuant to Title VI do not define what constitutes "voluntary" compliance other than to state that noncompliance is to be resolved "by informal means whenever possible." 45 C.F.R. § 80.7(d); 45 C.F.R. § 80.8(a). Nor does the case law address the question.

Courts have, however, defined "voluntary" with great specificity in other legal contexts. "[T]o be voluntary, a plea must be free of threats or other coercion that would impermissibly distort . . . choice." Note, Rule 11 and Collateral Attack on Guilty Pleas, 86 Yale L.J. 1395, 1397–98 (1977). Consent granted under the threat of severe reprisals if agreement is withheld is involuntary. *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970). *Cf.* 13 Willi-

ston on Contracts § 1602, at p. 657, § 1603, at p. 663 (3d ed. 1970); Restatement of the Law Second, Contracts, Tentative Draft No. 12, § 319 at p. 43 (March 1, 1977).

By any definition, the facts of this case strongly suggest that the HEW-Board of Education Agreement of September 7, 1977 was not "voluntary." We do not suggest that any "agreement" entered into under such circumstances would be "void" because "coerced." Rather, we more narrowly determine that when such circumstances exist, Title VI requires substantial public participation in the decision-making process.

The chronology detailed above makes it clear that the Board of Education was under enormous pressure to accept the September 7, 1977 Memorandum of Understanding. Commissioner Goldberg's July 1, 1977 letter informed the Board that it would be denied eligibility for required ESAA funds. Show cause hearings were held later in the summer and the decision was not made absolutely final until mid-September when Commissioner Goldberg informed the Central Board and Local Board 11 that it would not reconsider the denial of the funds. But as of July, 1977, the City knew that ESAA funding would be cut-off by HEW. HEW's action on the four million of ESAA funding directly imperiled the more than 250 million of federal dollars needed to keep the City's school system afloat. The imminent threat of massive fund cut-offs left the City little choice but to agree to the terms of the September 7, 1977 Memorandum. We take judicial notice of the severe fiscal pressures facing the City at this time. These pressures made it impossible for the City to afford fund withholding while it litigated the merits of HEW's charges. For all practical purposes, the City was at the mercy of the federal authorities.

These circumstances distinguish this case from *Citizens Legal Defense Alliance, Inc. et al. v. HEW*, 76-C-1614, 76-C-2472 (C.D. Cal. June 24, 1977). That case involved a similar agreement between HEW and the Los Angeles Board of Education. Acknowledging that it had "jurisdiction to decide the Title VI claim," (*id.* at 18), the court found no violation of the procedural requirements of Title VI. *Id.* at 20–21. It specifically ruled that "the Plan was voluntarily enacted by the District." *Id.* at 20.

We offer no hard and fast rule as to when the boundary between "voluntary" and "non-voluntary" is crossed. In the absence of administrative regulations, this judgment requires an inquiry into the totality of circumstances by the reviewing court on a case by case basis. Promulgation of adequate administrative regulations will avoid the necessity for future inquiries of this kind.

Our finding of non-voluntary compliance in this case is based upon a number of considerations. These include the contemporaneous ESAA fund cut-offs by HEW, the enormous amount of federal aid at stake, the inability of the City to survive the threat of fund withholding while it litigated the matter, the nature of the rights affected, and the ease with which some form of public participation could have been provided for. No emergency in this case demanded unusually speedy action by HEW.

Title VI provides for informal procedures when compliance is voluntary and formal procedures when compliance is achieved by a fund cut-off. In this case, where there was neither "voluntary" compliance nor an attempted fund cut-off, but rather "non-voluntary" compliance, the rigid Title VI dichotomy does not make clear what procedures are required. In view of the scant legislative history, an inquiry into the spirit as well as the letter of the law is required. We turn first to the questions of standing and judicial review under Title VI.

### 2. Standing to Seek Judicial Review

Section 10(a) of the Administrative Procedure Act grants the right of judicial review to any person "adversely affected or aggrieved by agency action." 5 U.S.C.

§ 702. In *Association of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), the Court defined "standing" in terms of a two-part test. First, the complainant must allege that the challenged action "has caused him injury in fact, economic or otherwise." *Id.* at 152, 90 S.Ct. at 829. This is sometimes called "access standing." *See Evans v. Lynn,* 537 F.2d 571, 602 (2d Cir. 1976) (en banc) (Oakes, J., dissenting). Second, "the interest sought to be protected by the complainant [must be] arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Serv. Organizations v. Camp, supra* at 153, 90 S.Ct. at 829–30. This is sometimes referred to as "decision standing." *Evans v. Lynn, supra* at 602. The court must inquire whether as a matter of policy making responsibility the particular issue is suitable for determination by the courts. *Ibid.* Plaintiff teachers and unions of teachers and of supervisors satisfy both requirements.

■ There can be little question that the teachers, supervisors and administrators have all sustained "injury in fact."

> The hallmark of a case or controversy is the presence of adverse interests between parties who have a substantial personal stake in the outcome of the litigation. Standing to sue, in its Constitutional sense, is the showing by a plaintiff that his particular grievance meets this standard, the "essence" of which is the presence of "injury in fact" suffered by the plaintiff as a result of the defendant's actions.

*Evans v. Lynn,* 537 F.2d 571, 591 (2d Cir. 1976) (en banc) (footnotes omitted). The teachers' injury is neither "abstract" nor "hypothetical." *Id.* As a result of the Memorandum of Understanding plaintiff teachers will be assigned to schools on the basis of their race. In addition to injury to their sense of justice in being assigned to teaching duties because of racial rather than pedagogical qualities, such practical injuries as added travel time or assignment to schools in more dangerous neighborhoods may be involved.

■ The CSA has standing to challenge the September 7, 1977 Memorandum of Understanding both in its own right, and on behalf of its members. The agreement allegedly abrogates the seniority provision, Section L, of CSA's collective bargaining contract with the Board of Education, thus creating a sufficient interest to confer standing upon the union. *See, e. g., E.E.O.C. v. American Telephone and Telegraph Co.,* 506 F.2d 735, 741–42 (3d Cir. 1974).

■ The CSA also has standing to challenge the agreement on behalf of its membership. As allegations 8–11 of its complaint demonstrate, several categories of CSA members are adversely affected or aggrieved by the agreement. *See, e. g., Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F.2d 159, 166 (3d Cir. 1971), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971). Two groups of assistant principals presently eligible for higher supervisory positions may have a reduced chance for promotion because of the provisions that call for the merger of existing eligibility lists and affirmative action requirements for appointment on the basis of sex. A third group of aggrieved CSA members are those supervisors who were excessed after their positions were abolished and who are now on preferred eligibility lists. Pursuant to the collective bargaining contract and state statute, these excessed supervisors have preference for jobs over persons just entering the profession. Paragraph 8 of the September 7, 1977 Memorandum may adversely affect their prospects for recall and re-employment since, unlike paragraph 7 which deals with teaching personnel, it does not differentiate between appointments of new personnel and reappointment of excessed personnel. The CSA alleges that this is an abrogation of the recall rights of these plaintiffs possessed under state law and union contract. Impingement upon seniority rights was the basis for CSA standing in *Chance v. Board of Examiners,* 534 F.2d 993, 996 (2d Cir. 1976).

■ Both the teachers and supervisors also satisfy the second prong of the standing test. Commenting on the "zone of interests" test in *Association of Data Processing Serv. Organizations v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970), Mr. Justice Douglas noted that "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action." Title VI, as we demonstrate below, entitles the parties to some type of participation in a decision that conditions future funding on a possible substantial impairment of their rights. Failure of HEW to permit them to be heard places them squarely within the "zone of interests" that Title VI was meant to protect. *See Warth v. Seldin,* 422 U.S. 490, 501, 514, 95 S.Ct. 2197, 2206, 2213, 45 L.Ed.2d 343 (1975).

### 3. *Judicial Review*

Title VI explicitly grants review to any person aggrieved by an agency decision to terminate funds, 42 U.S.C. § 2000d–2 (1970), and review of agency action other than termination of funds if an independent statutory basis for such review exists.

> Any department or agency action taken pursuant to [the enforcement provisions of Title VI] shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds.

The Administrative Procedure Act (APA) establishes a right of judicial review, subject to certain exceptions, for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702 (1970). "Agency action" includes any "failure to act." 5 U.S.C. § 551(13) (1970). Review is not available if the action is "committed to agency discretion by law" or if other statutes "preclude review." 5 U.S.C. § 701(a) (1970).

#### (a) *Agency Action Committed to Agency Discretion by Law*

■ The enforcement of Title VI has been determined to be outside the committed to agency discretion exception and thus subject to judicial review.

Appellants insist that the enforcement of Title VI is committed to agency discretion, and that review of such action is therefore not within the jurisdiction of the courts. But the agency discretion exception to the general rule that agency action is reviewable under the Administrative Procedure Act, 5 U.S.C. §§ 701–02, is a narrow one, and is only "applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' S.Rep.No. 752, 79th Cong., 1st Sess., 26 (1945)." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). The terms of Title VI are not so broad as to preclude judicial review. A substantial and authoritative body of case law provides the criteria by which noncompliance can be determined, and the statute indicates with precision the measures available to enforce the Act.

*Adams v. Richardson,* 156 U.S.App.D.C. 267, 269–270, 480 F.2d 1159, 1161–62 (1973) (en banc). *See* Note, Enforcing a Congressional Mandate: LEAA and Civil Rights, 85 Yale L.J. 721, 724 n. 16 (1976).

In *Adams,* plaintiffs brought an action for declaratory and injunctive relief to compel HEW and the Office of Civil Rights to enforce the Civil Rights Act and terminate the funding of discriminatory school districts. HEW contended that although Title VI requires enforcement, the means of enforcement is a matter of absolute agency discretion, thus permitting HEW to seek voluntary compliance. The Court rejected this argument. *Id.* 156 U.S.App.D.C. 271–272 at 1163–64.

#### (b) *Preclusion of Review by Statute*

■ Title VI does not preclude judicial review by any express statutory language. Under such circumstances, the Administrative Procedure Act provides a presumption of reviewability:

The chief significance of the APA in the area of reviewability is that it provides a presumption that Congress did intend to make review available unless convincing evidence of a contrary congressional purpose is demonstrated, thereby eliminating the possibility that a court might construe the mere omissions by Congress of any provision for judicial review of certain agency decisions or upon petition by certain parties as being itself a manifestation of the intent to prohibit review. Note, Statutory Preclusion of Judicial Review Under the Administrative Procedure Act, 1976 Duke Law J. 431, 449.

■ This presumption is strongest where, as in the instant case, HEW's action is subject to challenge as a denial of due process. "[W]here agency action is challenged as a denial of due process, it is 'immune from judicial review, if ever, only by the plainest manifestation of congressional intent to that effect.'" *Aquavella v. Richardson,* 437 F.2d 397, 402 (2d Cir. 1971). *See Gonzalez v. Freeman,* 334 F.2d 570, 575 (D.C. Cir. 1964); *Americana Nursing Centers, Inc. v. Weinberger,* 387 F.Supp. 1116 (S.D.Ill.1975).

4. *Legislative Intent*

The legislative history of Title VI does not shed much light on what Congress meant by the phrase "compliance . . . secured by voluntary means" in section 2000d–1 of title 42. Discerning legislative intent is particularly difficult because of the sheer volume of Congressional debate on the 1964 Civil Rights Act. There were more than 10 million words of comment filling over 6,300 pages in the Congressional Record. They are replete with warnings, largely by opponents of the legislation, of the enormous unchecked power the Act vested in federal bureaucrats. *See, e. g.,* 110 Cong.Rec. 2498–99 (Feb. 7, 1964); *id.* at 15890 (July 2, 1964); *id.* at 2469 (Feb. 7, 1964); *id.* at 14459 (June 19, 1964); *id.* at 14446 (June 19, 1964). Requiring "a full written report" to Congress of the circumstances of any fund cut-offs (42 U.S.C. § 2000d–1) suggests the seriousness with which Congress viewed the possibility of abuse through threats of fund cut-offs. *Cf.* Bruff and Gellhorn, Congressional Control of Administrative Regulation: A Study of Legislative Vetoes, 90 Harv.L.Rev. 1369 (1977).

■ Here ambiguity argues in favor of hearings. "[W]hen Congress creates a procedure that gives the public a role in deciding important questions of public policy, that procedure may not lightly be sidestepped by administrators." *Environmental Defense Fund, Inc. v. Ruckelshaus,* 142 U.S. App.D.C. 74, 84, 439 F.2d 584, 594 (1971). If the interests of the putative beneficiaries of federal grant-in-aid programs are not to be ignored in the accommodation of grantor and grantee interests through informal processes the beneficiary must participate.

There are growing indications . . . that the grantees and beneficiaries of many grant programs are without recourse in the face of autocratic decisions or indifference by federal administrators, who are unaccountable to a popular constituency and may be insensitive or unsympathetic to local problems and conditions. The position of the putative beneficiary of a grant program or protective condition is of particular concern. His interests depend upon the enforcement of federal standards and may be ignored in the accommodation of grantor and grantee interests through informal processes in which the beneficiary does not participate. Moreover, the effectuation of federal policy depends in large part upon whether these beneficiaries are secure in the enjoyment of their claims to benefits, services, or procedural protections.

Tomlinson and Mashaw, The Enforcement of Federal Standards in Grant-in-Aid Programs: Suggestions for Beneficiary Involvement, 58 Va.L.Rev. 600, 618–19 (1972) (footnote omitted).

Administrators, it has been charged, tend to consistently evade protective procedures. Fund cut-offs are generally not a preferred enforcement technique by federal officials. *See* Note, Enforcing a Congressional Man-

date: LEAA and Civil Rights, 85 Yale L.J. 721, 725 (1976). There are strong incentives to informally resolve enforcement controversies.

There are a number of reasons for the failure to enforce federal grant-in-aid requirements. At the most general level, the reason is that agencies are with few exceptions not "enforcement oriented." Grant-in-aid programs are, after all, meant to be cooperative efforts. The posture of the federal agency toward its grantees is not generally that of a referee calling fouls, but that of a coach giving support in the form of cash and expertise. Moreover, there are strong incentives for low-visibility conflict and accommodation. The mainstay of the federal enforcement arsenal, the fund cut-off, may have adverse effects. The remedy, if it has to be applied, helps no one and torpedoes the program. And while grantees may comply when threatened in a credible fashion with fund cut-off, the sanction raises the political stakes in any federal grantor/state or local grantee confrontation enormously. Federal grant personnel are hesitant to play, or play often, in high-ante games. Furthermore, sharp delineation of federal versus state positions and stringent efforts to exact compliance are likely to cause control of the conflict to shift from the hands of agency professionals to the hands of politicians. If this happens, the results will be unpredictable and from the program professional's viewpoint may be disastrous.

Tomlinson and Mashaw, *supra* at 619–20 (1972) (footnotes omitted).

■ Armed with the powerful threat of fund termination, officials can readily achieve enforcement through informal negotiations that do not necessarily take into full account the interests of the ultimate grant beneficiaries. The law does not permit procedural rights of beneficiaries to be eroded by local and federal officials who characterize a process as "informal compromise" rather than "strict enforcement."

### 5. Hearings: The Value of Public Participation

It may be urged that adding due process procedural protections may further inhibit use of the fund cut-off device to enforce federal policy requiring desegregation. This argument has repeatedly been made in other contexts. For example, hearings and reports required to consider environmental impact have been said to retard necessary economic progress. Sunshine laws opening up meetings of public boards and agencies to the public and the press are often an inconvenience to officials who believe they know what is best for the public. Perhaps they do; often the result of due process is to achieve the same result that would have been obtained by uninhibited official action.

But ours is a government of the people even though it may be run by technicians. The people have a right to know what is going on and to express their views, however misguided they may appear to those who control the government's operation. For very good historical reasons, we have faith in the ultimate good judgment of the American people. Our system of decision-making may be awkward and inefficient at times, but it affords the greatest protection against gross errors of judgment and arbitrary exercise of power. It minimizes unnecessary injustice to the individual. It gives even those who have lost a public argument the sense that they have had their say. It creates feelings of mutual respect and fraternity without which freedom and internal peace cannot survive.

■ The right to notice and hearing is indispensable in protecting the individual against abuse by government.

No better instrument has been devised for *arriving at truth* than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it. Nor has a better way been found for *generating the feeling,* so important to a popular government, *that justice has been done.*

*Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 649, 95 L.Ed. 817 (1951) (Frankfurter, J.,

concurring) (emphasis added, footnote omitted). *See* Subrin and Dykstra, Notice and the Right to be Heard: The Significance of Old Friends, 9 Harv. C.R.–C.L. L.Rev. 449, 451–58 (1974). *Cf. Mildner v. Gulotta,* 405 F.Supp. 182, 210 ff. (E.D.N.Y.1975) (dissent).

Two fundamental values are at stake. The first, "arriving at truth," concerns the accurate and efficient execution of societal policies including the achievement of order and predictability. *Id.* at 452. The second, "generating the feeling that justice has been done," focuses on human dignity in a democracy. *Id.*

The second value, though less discussed by the courts, is important in explaining the need for a "hearing" in the instant case. Generally, notice and hearing help foster a sense of individual dignity and worth in those who consider themselves aggrieved. *Id.* at 454.

> For government to dispose of a person's significant interests without offering him a chance to be heard is to risk, treating him as a nonperson, an object, rather than a respected, participating citizen.

Karst, The Supreme Court 1976 Term, Foreword: Equal Citizenship Under the Fourteenth Amendment, 91 Harv.L.Rev. 1, 30 (1977) (footnote omitted). Stated somewhat differently:

> Decency requires that men who have a great deal to lose from an official decision be given an opportunity to contest it. But the decency in question is not a matter of small courtesy or of propriety. It is, rather, the decency that prevails when a community is so governed that no man need fear that he will be treated as a mere means.

Pincoffs, *Due Process, Fraternity, and a Kantian Injunction,* in Nomos XVIII: Due Process 172, 180–1 (J. Pennock & J. Chapman eds. 1977). *See also,* Tribe, Structural Due Process, 10 Harv. C.R.–C.L. L.Rev. 269, 311–14 (1975); Stewart, The Reformation of American Administrative Law, 88 Harv. L.Rev. 1669, 1760–61 (1975).

### 6. *Required Procedures*

This court need not determine at this time precisely what procedural protections plaintiffs are entitled to under Title VI to assure adequate participation in the decisionmaking process. The task is better left to HEW. There are numerous models that might satisfy Title VI requirements.

One possible design is suggested by the Federal Trade Commission Act. 15 U.S.C. § 45. The statute provides only for cease and desist orders, which can be issued only after a hearing. The FTC regulations, however, include a consent order procedure, a vital intermediate procedure between voluntary, informal negotiations and a full hearing. Subpart B—Informal Enforcement Procedure, 16 C.F.R. § 2.21, provides for "voluntary compliance." In determining whether the public interest will be fully safeguarded by disposing of a matter on an informal non-adjudicatory basis, the Commission must consider: (1) the nature and gravity of the alleged violation; (2) the prior record and good faith of the parties involved; and (3) other factors, including, where appropriate, adequate assurance of voluntary compliance. Subpart C—Consent Order Procedure, 16 C.F.R. §§ 2.31–2.35, provides an opportunity for a party being investigated to submit a proposed consent order "where time, the nature of the proceeding, and the public interest permit." 16 C.F.R. § 2.31. The regulations permit the Commission to negotiate informally with a proposed respondent to reach a pre-complaint consent agreement. Upon receiving an executed agreement, the Commission may either accept it, reject it and issue its complaint, or take such other action as it deems appropriate. 16 C.F.R. § 2.34. If the Commission accepts the agreement, it must place the order and any initial report of compliance on the public record. At the same time, it must make available an explanation of the provisions of the order, and the relief to be obtained pursuant to the order, and any other information which it deems helpful in assisting interested persons to understand the terms of the order. It must also publish the agreement, order, and explanation in the

Federal Register. For a period of sixty days after placement of the order on the public record and issuance of the statement, the Commission must receive and consider any comments or views concerning the order that may be filed by any interested persons. After the expiration of sixty days, it may either withdraw its acceptance of the agreement and so notify the other party, or leave the consent order intact. *Id. See Action on Safety and Health v. F.T.C.,* 162 U.S.App.D.C. 215, 217, 498 F.2d 757, 759 (1974). The accord reached by the Board of Education and HEW is in substance, if not form, a consent order.

A second alternative would be to hold a modified hearing that, at the very least, gave members of the public an opportunity to voice their opinions. Such a hearing might be conducted by an administrative judge using procedures developed for approving settlement of class actions. At class action settlement hearings conducted by a court, the judge "should learn the circumstances surrounding the negotiations and *hear* not only from the parties and counsel who participated in the negotiations but also *from those, if any, who were left out of the negotiations.*" 1 Moore's Federal Practice, Part 2, Manual for Complex Litigation—1.46 Settlement of Class Actions: Criteria and Procedure in Approving Settlements of Class Actions—Part I—Procedures at 63 (1977) (emphasis added).

B. *Avoidance of Constitutional Questions*

This litigation raises serious constitutional questions. As the Supreme Court recently noted, three factors are of principal relevance in determining what process is constitutionally due:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). *See Board of Curators of the University of Missouri et al. v. Horowitz,* —— U.S. ——, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). These factors are at least arguably present in this case, lending support to the claim that an administrative hearing is mandated by the Constitution.

In keeping with long-established principle, we rule only on the procedural requirements of Title VI, and not on the constitutional issue. Statutory interpretation in this case obviates the need to pass on questions of constitutionality. *See, e. g., Rosenberg v. Fleuti,* 374 U.S. 449, 451, 83 S.Ct. 1804, 1806, 10 L.Ed.2d 1000 (1963).

## IV. CONCLUSION

In view of our ruling that HEW has not properly complied with procedures required by Title VI, we remand this matter to HEW for further proceedings in accordance with this opinion. The September 7, 1977 Memorandum of Understanding is set aside. Any reassignments or other action already taken pursuant to the Memorandum are unaffected by this decision. The decision is stayed until April 7, 1978 to permit appropriate appellate applications and to minimize any disruption caused by the termination of existing assignment plans. Nothing in this opinion should be construed as inhibiting anyone from taking legislative or other action to meet any problems of possible discrimination in the New York City school system.

So ordered.

## APPENDIX

## MEMORANDUM OF UNDERSTANDING BETWEEN: THE BOARD OF EDUCATION OF THE CITY OF NEW YORK AND THE OFFICE FOR CIVIL RIGHTS, UNITED STATES DEPARTMENT OF HEALTH, EDUCATION AND WELFARE

The Board of Education agrees to adopt and implement, and the Office for Civil Rights agrees to accept as compliance with the requirements of Title VI of the Civil

Rights Act of 1964 and Title IX of the Education Amendments of 1972, as to the subjects addressed, an affirmative action plan containing, in detailed form, the following commitments and affirmative actions with respect to the employment and assignment of teachers and supervisors in the New York school system:

1. Not later than September of 1979, the teacher corps of each District in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

2. Not later than September of 1980, each individual school in the system will reflect, within a range of five percent, the racial-ethnic composition of the system's teacher corps as a whole for each educational level and category, subject only to educationally-based program exceptions.

3. The Board of Education will demonstrate to the Office for Civil Rights, subject to prescribed review, that any failure to meet the commitments set forth in paragraphs one and two hereof results from genuine requirements of a valid educational program. In addition, the Board will demonstrate that it has made and is continuing to make special efforts to overcome the effects of educationally-based program exceptions through effective use of such mechanisms as recertification, recruitment and special assignment of teachers.

4. The Board of Education will adopt and implement the following affirmative action procedures, and will sponsor and actively support state legislation at the next session of the Legislature where necessary to accomplish these ends:

 a) Any test used henceforth to determine whether a person is qualified for a teaching position in the system shall be validated prior to its being administered; except that in cases of demonstrable educational necessity, for example, where there are no eligible lists, a test may be used prior to its validation for temporary assignments, provided that validation shall be accomplished as soon as practicable.

 Tests shall be validated pursuant to accepted professional standards as exemplified in the Uniform Guidelines for Employee Selection Procedures (41 Fed.Reg. 51734, Nov. 23, 1976). Prior to the administration of any test, the Office for Civil Rights shall have a reasonable opportunity to review and consult with respect to the design and implementation of the proposed validation.

 b) All existing eligibility lists by license shall be combined, and the names of all persons contained thereon shall be merged with the names of any persons who have passed any new tests, without regard to the dates of examinations.

 c) Rank ordering of persons who have passed examinations for the system shall be abolished.

 d) In employing and assigning teachers pursuant to these modified standards and procedures, the Board of Education will implement affirmative action mechanisms found to be appropriate, such as, for example, giving hiring preference to all eligible persons with prior experience in the system.

 e) In implementing such modified standards and procedures, the Board of Education will take all steps necessary to ensure fulfillment of the foregoing objectives, throughout the system.

5. The Board of Education agrees that, in the event that the above-described legislation is not adopted so as to govern employment decisions for the 1978–79 school year, the Board will seek appropriate litigation in support of the agreed objectives.

6. The Board agrees, as soon as practicable to have performed a study of the relevant qualified labor pool by race, ethnicity, and sex by an independent expert acceptable to the parties and pursuant to methodology and standards agreed to by the parties. Through the adoption and implemen-

tation of the affirmative action procedures and legislation provided in paragraph 4 of this Memorandum and other efforts taken or to be taken by the Board, the Board commits that by September of 1980, the levels of minority participation in the teaching and supervisory service will be within a range representative of the racial and ethnic composition of the relevant qualified labor pool.

It is understood that this commitment shall not require the Board to lay off any teacher currently employed by the Board or to hire any teacher who has not met appropriate requirements for employment, not inconsistent with this agreement. It is further understood that the commitment made herein does not establish quotas. Failure to meet this commitment shall not be considered a violation of this agreement if the Board demonstrates that it has implemented the provisions of this agreement in a good faith effort to meet the commitment made herein. [The commitment herein is subject to applicable standards of law. (See *Hazelwood School Dist. v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768).]

The Board has advised the Office for Civil Rights that the Board expects to consult with the United Federation of Teachers and others regarding the selection of the independent expert and the standards and methodology to be used in the above study. Likewise, the Office for Civil Rights has advised the Board that it expects to consult with other government agencies, civil rights organizations, and others regarding the selection of the independent expert and the standards and methodology to be used in the study.

7. The Board of Education agrees that all employment decisions for teaching personnel, other than those on the Preferred Lists, made between the date of the execution of this Memorandum and the effective date of the above described legislation will be subject to adjustments arising from the new legislation or successful litigation pursuant to Paragraph 5.

8. The Board of Education commits itself to pursue a program of affirmative action to increase the number of women in the supervisory service, including a plan to reach a systemwide level of participation by women within a range representative of the pool of available qualified women by a date to be agreed upon with the Office for Civil Rights. The Board further agrees that it will establish a procedure whereby no person shall be appointed to a supervisory position until an affirmative action officer in the central personnel administration has studied the file of applicants for the particular position and determined that the appointment process demonstrates good faith compliance with the affirmative action plan. The Board agrees to review with the Office for Civil Rights the appropriateness of standards and procedures for selection of supervisory personnel to insure conformity to this paragraph.

9. Not later than one hundred twenty days after the execution of this Memorandum the Board of Education shall submit to the Office for Civil Rights a detailed plan describing the steps and mechanisms to be used in attaining the objectives set forth herein. This plan shall include interim objectives stated by year, by which the Board will achieve the commitments made herein. During the 120 day period and thereafter during the term of this agreement, the Board of Education will cooperate with the Office for Civil Rights in generating and sharing data and information with respect to compliance with the terms of this Memorandum and the fulfillment of its objectives. The Board shall file with the Office for Civil Rights annual reports at times to be agreed upon by the parties demonstrating the progress toward the interim and final objectives.

The Board of Education of the
City of New York,
by:
 IRVING ANKER
 Chancellor
The Office for Civil Rights,
United States Department of
Health, Education and Welfare,
by:
 DAVID S. TATEL
 Director

Date: September 7, 1977

The United Federation of Teachers commits itself to support the adoption of legislation, as soon as possible during the 1977–78 term of the New York Legislature, with respect to the provisions of paragraph four of the foregoing Memorandum of Understanding between the Board of Education of the City of New York and the Office for Civil Rights of the United States Department of Health, Education and Welfare, including specifically those provisions relating to abolition of rank ordering of eligibility lists and merging such lists without regard to the dates of examination.

Albert Shanker, President