**NATIONAL ASSOCIATION FOR the ADVANCEMENT OF COLORED PEOPLE et al., Plaintiffs,**

v.

**The WILMINGTON MEDICAL CENTER, INC., et al., Defendants.**

Civ. A. No. 76–298.

United States District Court, D. Delaware.

June 21, 1978.

in the Choice of National and States Rules for Decision, 105 U.Pa.L.Rev. 797 (1957).

See also, D.C., 453 F.Supp. 280.

Douglas Shachtman, Community Legal Aid Society, Inc., Wilmington, Del., Marilyn G. Rose and Herbert Semmel, Center for Law and Social Policy, Washington, D. C., and Louise Lander, New York City, for plaintiffs.

Jeffrey M. Goddess, City Sol., Charles H. Toliver IV, and Alan Bernard Scher, Asst. City Sols., Wilmington, Del., for plaintiff intervenor, City of Wilmington.

Rodney M. Layton and William J. Wade of Richards, Layton & Finger, Wilmington, Del., for defendants The Wilmington Medical Center, Inc., Crawford H. Greenewalt and Joseph A. Dallas.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., Barbara Allen Babcock, Asst. Atty. Gen., Barbara B. O'Malley and Rebecca L. Ross, Trial Attys., Dept. of Justice, Washington, D. C., Stephanie W. Naidoff, Regional Atty., and William Reinhart, Asst.

Regional Atty., H. E. W., Philadelphia, Pa., for defendant Secretary of H. E. W.

Edward F. Kafader, Asst. Atty. Gen., Dept. of Justice, Dover, Del., for defendant Amos Burke, Director of the Bureau of Comprehensive Health Planning.

William C. Gordon, pro se.

## OPINION

LATCHUM, Chief Judge.

This civil rights class action, spawned by the controversial proposal of the defendant Wilmington Medical Center to relocate the bulk of its urban hospital services to a suburban location, is presently before the Court on cross-motions for partial summary judgment filed by the defendant Secretary of Health, Education and Welfare and by the plaintiffs.[1] These motions were filed in response to the second amended and supplemental complaint[2] in which the plaintiffs for the first time asserted a cause of action against the Secretary based on a challenge to the constitutionality of the administrative regulations promulgated by the Secretary in the implementation of Title VI of the Civil Rights Act of 1964[3] and Section 504 of the Rehabilitation Act of 1973.[4]

Plaintiffs contend that the procedures established by the Secretary for enforcing the antidiscrimination provisions of Title VI and Section 504 abridged the plaintiffs' right to due process of law, because such procedures fail to provide a "fair hearing" to persons whose discrimination complaint against a recipient of federal financial assistance is settled through informal, voluntary compliance measures required under the statutes and the regulations. Alternatively, the plaintiffs argue that the regulations violate their right to the equal protection of the law[5] since applicants for, or recipients of, federal assistance are accorded a "fair hearing" before the grant of assistance to them may be withheld or terminated while persons charging a particular recipient with discrimination are denied a "fair hearing" on the merits of their claims.

## I. THE REGULATIONS.

In order to implement the legislative mandate expressed in Title VI and Section 504, HEW and other federal agencies empowered to extend financial assistance were required to issue rules, regulations or orders of general applicability to carry out the objectives of the laws in question.[6] The regulations at issue in this case, found at 45 C.F.R. Part 80 (Title VI) and 45 C.F.R. Part 84 (Section 504),[7] divide the Secretary's enforcement duties into four phases: (1) the investigative phase; (2) the voluntary compliance phase; (3) the administrative hearing phase; and (4) the fund termination phase. The investigative phase is triggered whenever HEW has reason to believe, because of a complaint or other information, that a recipient of federal aid has failed to abide by or comply with HEW's rules and regulations. 45 C.F.R. § 80.7(a)–(c). A finding of noncompliance activates the

1. Docket Items 241 & 248. No issues of fact material to the resolution of the questions raised by the cross motions are in dispute.

2. See Docket Item 197 (Second Amended and Supplemental Complaint); see also Docket Item 231 at 3 (December 28, 1977 Transcript of Oral Argument).

3. 42 U.S.C. §§ 2000d et seq.

4. 29 U.S.C. § 794.

5. It is well settled that the Due Process Clause of the Fifth Amendment encompasses equal protection principles. E. g., Mathews v. DeCastro, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976); Ellis v. HUD, 551 F.2d 13 (C.A.3, 1977).

6. See 42 U.S.C. § 2000d–1; Executive Order 11914, 41 Fed.Reg. 17871 (April 28, 1976) (29 U.S.C. § 794 note (1978 Supp.)).

7. Pending the adoption of consolidated procedural regulations governing all of the civil rights statutes for which HEW has enforcement responsibilities, the procedural provisions applicable to Title VI (see 45 C.F.R. §§ 80.6–.10 and 45 C.F.R. Part 81) are expressly incorporated by reference into the Section 504 regulations. 45 C.F.R. § 84.61. Citations throughout this opinion to the procedural provisions contained in the regulations implementing Title VI will therefore include by reference the provisions applicable under Section 504.

second phase; the statutes [8] and the regulations *require* the Secretary to first endeavor informally to secure the offending recipient's voluntary compliance with HEW rules and regulations. *See* 45 C.F.R. § 80.7(d)(1). If the Secretary determines that compliance cannot be voluntarily achieved, then the recalcitrant recipient and the complainant, if any, are notified of the intention to terminate or withhold funding. However, the administrative hearing phase, which begins only after efforts at voluntary compliance have broken down, must precede the final decision to terminate federal aid. 45 C.F.R. § 80.8–80.11. The hearing consists of an evidentiary proceeding before an administrative law judge who makes a finding of compliance or noncompliance, subject to administrative appeal.[9] *Id.* The decision to terminate aid, after an express finding of noncompliance on the record, becomes effective thirty days after the filing of a full written report of the reasons for such a decision with the appropriate committees of the House and Senate.[10] *See* 42 U.S.C. § 2000d–1; 45 C.F.R. § 80.8(c).

## II. THE FACTS.

At the time this law suit was commenced in September, 1976, no administrative complaint had been filed by the plaintiffs with the Secretary.[11] Nevertheless, the Court held that service of the complaint in this case upon the defendant Secretary constituted sufficient information of a possible failure to comply with Title VI and Section 504 to trigger investigative review.[12] Thus, in accordance with the Secretary's regulations the allegations of the plaintiffs' complaint, together with other information supporting their view that the proposed hospital relocation (Plan Omega) would have a discriminatory impact prohibited by the statutes, were promptly and thoroughly investigated.[13] In early July, 1977, the investigation culminated in a finding that Plan Omega would, as the plaintiffs had in fact charged, contravene the national antidiscrimination policy mandated by Title VI and Section 504.[14] The recipient, Wilmington Medical Center (WMC), and the plaintiffs, as complainants, were duly informed of HEW's finding of noncompliance and the circumstances of, and the grounds for, that finding. Plan Omega was deemed legally inadequate because, *inter alia*, its concept at dual facilities with duplicated services, its patient/physician "option" mode of admission, and the travel burdens peculiarly affecting minorities, the poor and the handicapped seeking access to the new suburban hospital, would likely have a discriminatory

---

**8.** 42 U.S.C. § 2000d–1. *See also* Executive Order 11914, *reprinted in* 29 U.S.C. § 794 note (1978 Supp.).

**9.** The ALJ's decision may be appealed to a "Reviewing Authority" which reviews the decision on the basis of the certified record. 45 C.F.R. § 80.10(a), (b). After a written copy of the Reviewing Authority's decision is furnished to the recipient and to the complainant, if any, the Secretary may, in the exercise of his discretion, grant a request to review that decision. *Id.* § 80.10(c). While the Secretary's decision is administratively final, any person aggrieved thereby may obtain judicial review under the Administrative Procedure Act and the decision shall not be deemed "committed to unreviewable agency discretion." 42 U.S.C. § 2000d–2; 45 C.F.R. § 80.11. The Administrative Procedure Act, in turn, allows the federal courts to set aside agency decisions in certain specified instances. 5 U.S.C. §§ 705, 706(2).

**10.** Termination of federal assistance, however, is not the only sanction by which HEW can seek to bring a recalcitrant recipient into compliance. Other less drastic measures include a referral to the Attorney General who may bring an action under appropriate laws of the United States or an action to specifically enforce rights created under any assurance or other contractual undertaking. 45 C.F.R. § 80.8(a), (d); *see* H.R.Rep.No.914, 88th Cong., 1st Sess. 86 (1963), U.S.Code Cong. & Admin.News 1964, p. 2355; Guidelines for the Enforcement of Title VI, Civil Rights Act of 1964, 28 C.F.R. § 50.3 at 333 (1977) (suggesting a number of administrative alternatives to fund termination).

**11.** Docket Item 23, Dodds Affidavit.

**12.** *NAACP v. Wilmington Medical Center, Inc.,* 426 F.Supp. 919, 924 (D.Del.1977).

**13.** *See, e. g.,* Docket Item 82 (Report To The Court Concerning Investigation Of Plan Omega With Respect To Alleged Title VI Violations).

**14.** Docket Item 124 (HEW's July 5, 1977, Letter of Findings).

impact upon plaintiffs and the class they represent.[15] HEW also informed WMC that it could challenge and seek to rebut the prima facie finding of noncompliance through an administrative hearing or it could elect to modify Plan Omega in accordance with various conditions and assurances that HEW had indicated would eliminate Plan Omega's potential discriminatory effect.[16] Faithful to the legislative mandate, HEW began informal negotiations with representatives of WMC aimed at bringing Plan Omega into compliance. As a result of these negotiations, WMC decided voluntarily to modify Plan Omega and agreed to adopt HEW's recommendations concerning the conditions and assurances necessary to secure Plan Omega's compliance with the civil rights laws. A contract formally embodying these assurances and conditions was executed on November 1, 1977.[17] It is also noteworthy that counsel for, and other representatives of, the plaintiffs were permitted to participate and to submit relevant information not only during HEW's investigative phase, but also during the extensive deliberations between HEW and WMC in the voluntary compliance phase.[18] Counsel for plaintiffs was afforded the opportunity, for example, to suggest possible assurances which HEW should require of WMC and to comment upon and to criticize assurances proposed by WMC or by HEW itself.[19] In any event, the voluntary compliance phase of the Secretary's enforcement responsibilities came to a successful conclusion upon the execution of the contract of assurances. That is, the Secretary concluded that Plan Omega, as modified by the assurances, would comport with Title VI and Section 504 and there were thus no grounds for commencing the administrative hearing phase of his Title VI enforcement procedures. Since the plaintiffs did not share the Secretary's confidence in the adequacy of the assurances, however, the Secretary's decision to approve the contract was challenged in this Court pursuant to the judicial review provisions of the Administrative Procedure Act.[20] In an earlier opinion, the Court concluded that the Secretary's decision to approve the contract of assurances, measured by the arbitrary and capricious standard of judicial review, was rationally supported by the evidence of record.[21] Having affirmed the Secretary's decision, the Court granted summary judgment in his favor and against the plaintiffs.[22]

## III. THE PROCEDURAL DUE PROCESS CLAIM.

In what can be viewed in one sense as a form of collateral attack on the Secretary's determination regarding Plan Omega, plaintiffs now urge the Court to invalidate the Secretary's regulations as violative of the due process rights of complainants, because of the failure to accord them an "evidentiary hearing" on the issue whether Plan Omega, as modified, was consistent with the dictates of Title VI and Section 504. Although they have not specifically articulated the due process deficiencies of the Secretary's regulations, plaintiffs apparently contend that they fail to provide (1) the right to submit relevant information to the Secretary in support of a complain-

15. See id., passim.

16. Id. at 7, 22.

17. Docket Item 174 (Contract of Assurances).

18. See NAACP v. Wilmington Medical Center, Inc., 453 F.Supp. 280 at 291, 292, 304–306, 326 (D.Del. April 7, 1978). See also HEW's Certified Administrative Record, Exhibits M–0; M–4; M–13; C–5; C–17; C–24; C–26; C–29; C–33; C–49.

19. One provision in the contract of assurances—the so-called unitary operations clause—was actually suggested by counsel for the plaintiffs, even though she later challenged the Secretary's decision to adopt her suggestion as being arbitrary and capricious. See NAACP v. Wilmington Medical Center, Inc., supra, at 325–327.

20. See 42 U.S.C. § 2000d–2; NAACP v. Wilmington Medical Center, Inc., 453 F.Supp. 280 (D.Del. April 7, 1978).

21. NAACP v. Wilmington Medical Center, Inc., 453 F.Supp. 280 at 306–330 (D.Del. April 7, 1978).

22. Id., at 330; Docket Item 262.

ant's position that he or she has suffered, or is likely to suffer, discrimination at the hands of a recipient; (2) an opportunity to review and comment upon proposed assurances, developed in the course of voluntary compliance negotiations, which the Secretary has concluded will eliminate or substantially mitigate the recipient's alleged discriminatory actions; and (3) if voluntary compliance is nevertheless achieved, a right to a trial-type hearing conducted by an impartial decisionmaker, together with other usual protections of an adjudicatory proceeding,[23] at which the complainant may challenge the legal or factual sufficiency of the remedy prescribed by the Secretary and acquiesced in by the recipient. These procedures, argue the plaintiffs, are essential for the protection of their interests as the putative beneficiaries under Title VI and Section 504. They suggest, for example, that HEW cannot fairly represent the interests of a complainant while simultaneously seeking to achieve voluntary compliance by the offending recipient because of the cooperative nature of the low-visibility informal settlement procedure and because of the reticence of federal agencies to utilize the mainstay of their enforcement arsenal, the so-called fund cut-off. *See* Tomlinson and Mashaw, *The Enforcement of Federal Standards In Grant-In-Aid Programs: Suggestions For Beneficiary Involvement,* 58 Va.L.Rev. 600, 618–21 (1972). Moreover, plaintiffs contend HEW lacks the qualified personnel and fiscal resources needed to adequately investigate every complainant's charges of discrimination. They argue that complainants alone have both the motive and the information required to insure full consideration of their charges. Finally, they insist that a trial-type hearing is necessary to properly ventilate the conflicting views of HEW, plain-

tiffs and the recipient (WMC) on the issues and sub-issues raised during the investigation of the charges leveled against Plan Omega and the subsequent formulation of an appropriate remedy designed to secure Plan Omega's compliance with Title VI and Section 504. Thus, if the Court were to agree with plaintiffs' contentions, the result would be a remand to the Secretary with directions to adopt regulations providing, *inter alia,* an adjudicatory proceeding to complainants dissatisfied with an informal, negotiated settlement of their complaint of discrimination by a recipient of or applicant for federal aid.

■ Procedural due process protections serve to constrain arbitrary governmental decisions that deprive individuals of either a "liberty" or "property" interest within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendments. *Memphis Light, Gas & Water Division v. Craft,* —— U.S. ——, ——, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *see* L. Tribe, *American Constitutional Law* § 10–12 (1978). The plaintiffs have identified, although not very lucidly, two types of interests that have allegedly been infringed without procedural due process as a result of the Secretary's enforcement procedures. First, they suggest that the Secretary's informal decision to approve the removal of health care facilities from an urban to a suburban location effectively deprives them of their right, as beneficiaries under medicare[24] and medicaid[25] programs, to economical and accessible health care. Second, plaintiffs contend that the decision to approve WMC's proposed hospital relocation, even as modified by the contract of assurances, infringes upon their rights to be free from discrimination on the

---

**23.** According to plaintiffs, the "hearing" should include the right to introduce relevant evidence, the right to counsel, and the right to cross-examine witnesses. Docket Item 255 at 2, 10, 12 (Transcript of March 3, 1978, Oral Argument). *See generally* 45 C.F.R. § 80.9 (nature of hearing provided to applicants for or recipients of federal assistance). It is not clear, however, whether other interested persons, ei-

ther aligned with or against the complainant, would be permitted to intervene at the hearing stage; nor have the plaintiffs made clear whether the recipient would participate as a party in the hearing. *Cf.* Docket Item 255 at 8.

**24.** 42 U.S.C. § 1395.

**25.** 42 U.S.C. § 1396.

basis of race and national origin (Title VI) or handicap (Section 504) under any program or activity receiving federal financial assistance. The Secretary, however, denies that the plaintiffs have been deprived of a "property" or "liberty" interest within the meaning of the Due Process Clause of the Fifth Amendment or that his regulations, even assuming the plaintiffs have a protectable interest, fail to accord to the plaintiffs, as complainants, all the process that is "due" them. He first notes that his decision to approve Plan Omega after substantial modifications will have no impact upon the individual plaintiffs' eligibility for benefits under medicare or medicaid; two other hospitals located within the City of Wilmington, moreover, are available to insure plaintiffs access to medical services reimbursed under federally funded health programs. The Secretary also maintains that there is no constitutionally protected right to access to medical services at a particular location, citing *Jackson v. New York City Health & Hospitals Corp.,* 419 F.Supp. 809 (S.D.N.Y.1976). But even assuming there were such a right, the Secretary argues that the plaintiffs have not been deprived of access to medical care because (1) other accessible urban hospitals are capable of providing plaintiffs and similarly situated individuals with needed medical care, and (2) Plan Omega was approved only after it was modified to include a far-reaching hospital-provided transportation system designed to assure access by urban residents to medical services available at the proposed suburban facility. Finally, the Secretary contends that the plaintiffs' interests under Title VI and Section 504 are more attenuated, and thus require fewer procedural protections, than more conventional forms of "property" or "liberty" interests created under state or federal laws.

The Court agrees with the Secretary insofar as he argues that plaintiffs here do not have a conventional property or liberty interest. On the other hand, it should be clear by now that there are other interests besides the traditional ones that deserve protection from deprivation by arbitrary government action. *Cf. Memphis Light, Gas and Water Division v. Craft,* —— U.S. ——, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (termination of customer's utility services for nonpayment of a bill); *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (termination of Social Security disability benefits); *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension of student from public school for disciplinary reasons); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (termination of welfare benefits); *Joy v. Daniels,* 479 F.2d 1236 (C.A.4, 1973) (occupancy in quasi-public housing); *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (C.A.2, 1973) (rent increase in public housing).

Nevertheless, the Court need not determine whether the Secretary's decision concerning Plan Omega deprived plaintiffs of a constitutionally protected "liberty" or "property" interest. Assuming without deciding the existence of a protectable interest in this case,[26] the Court concludes that the Secretary's procedures were sufficient under the Due Process Clause of the Fifth Amendment and that plaintiffs were awarded all the process that was "due" them.

One of the primary objectives of procedural due process as applied to administrative proceedings is to insure that an agency will acquire the information it should have in a manner fairly calculated to illuminate the issues for reasoned decision-making,[27] and thereby to minimize the risk of erroneous or arbitrary action.[28]

---

**26.** Although a protectable interest is assumed to exist, the Court is required to consider, *see infra* pp. 339–341, the nature of the "private interest that [was] affected by the official action" as a relevant factor in determining the requisite due process. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

**27.** *Northern California Power Agency v. Morton,* 396 F.Supp. 1187 (D.D.C.1975), *aff'd without opinion,* 176 U.S.App.D.C. 241, 539 F.2d 243 (1976).

**28.** *Cf. Goss v. Lopez,* 419 U.S. 565, 579–82, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

█ In explicating a practical approach to the problem, the Supreme Court has repeatedly emphasized that "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation"[29] since "not all situations calling for procedural safeguards call for the same kind of procedure."[30] Nevertheless, "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all of the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[31] But the Supreme Court has also stressed its view that the nature of the right to be heard and the content of the notice will usually depend on appropriate accommodation of the competing private and governmental interests involved.[32] In a recent opinion, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Court elaborated upon the utilitarian analysis that courts should undertake in assessing the sufficiency of procedures in a particular situation:

> "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural safeguards would entail." *Id.* at 334–35, 96 S.Ct. at 903.

Applying this balancing approach,[33] the Court concludes that a trial-type hearing is not constitutionally required to secure the interests of plaintiffs and others similarly situated under Title VI or Section 504. Nor would such a hearing, in light of the existing procedural protections and a subsequent right to judicial review, significantly enhance the Secretary's established decision-making process by reducing the risk of erroneous or arbitrary action, although it would, because of the sheer number of potential complainants and the frequently technical nature of the issues involved, impose a significant burden on the federal agency.

A. *The Nature Of The Interest.*

█ Section 601 sets forth the general purpose of Title VI by stating that

> "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, *be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d (emphasis added),

---

**29.** *Cafeteria & Restaurant Workers Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

**30.** *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

**31.** *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). *See also Armstrong v. Manzo,* 380 U.S. 545, 550, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965); *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 171–72, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

**32.** *Goss v. Lopez, supra* 419 U.S. at 579, 95 S.Ct. 729; *Cafeteria Workers v. McElroy, supra; Morrissey v. Brewer, supra.*

**33.** At oral argument, plaintiffs' counsel seemed to suggest that the due process analysis reflected in *Mattern v. Weinberger,* 519 F.2d 150 (C.A.3, 1975) (challenging on due process grounds Secretary's procedures for recoupment of alleged overpayments of benefits under Social Security Act) should guide the Court's determination of the requisite due process in this case. Docket Item 255 at 7. However, since the judgment in *Mattern* was later vacated and remanded (*sub nom. Mathews v. Mattern,* 425 U.S. 987, 96 S.Ct. 2196, 48 L.Ed.2d 812 (1976)) for reconsideration in light of *Mathews v. Eldridge, supra,* the Court deems the analytical framework outlined in the *Eldridge* opinion controlling.

and Section 504 of the 1973 Rehabilitation Act similarly provides that

> "No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, *be denied the benefits of, or be subjected to discrimination* under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794 (emphasis added).

These are clear congressional statements that discrimination on the grounds of race, color, national origin or handicap against the ultimate beneficiaries[34] of federal financial assistance is unlawful. Thus the Secretary, in determining whether federal aid should be granted or continued, must take care to protect the rights of the intended class of beneficiaries and to enforce the general prohibition of the statutes.

In this case, as noted above, plaintiffs have asserted that the implementation of WMC's Plan Omega—whose operating revenues will be derived in large part from federal health assistance programs—will result in disparities in the quality and accessibility of medical services, a result they contend will necessarily impact disproportionately upon the poor, the aged, blacks, ethnic minorities and the handicapped. They also claim that the Secretary, in sanctioning the proposed relocation, has incorrectly concluded that the project will not violate the broad antidiscrimination standard in Title VI and Section 504; and, further, that he has failed to adopt appropriate procedures for protecting the interests of beneficiaries allegedly affected adversely whenever a federally-supported health care provider decides to relocate its medical facilities. At stake, therefore, is the plaintiffs' interest, protected by statute, in the nondiscriminatory delivery of medical care. In view of the obvious importance of the values protected by Title VI and Section 504, the plaintiffs' interest in adequate procedural safeguards is substantial. After all, they seek to insure that a private hospital's decision to relocate the major components of its urban hospital system to a suburban location is neither motivated by nor has the effect of unlawfully discriminating against blacks, the handicapped or other minorities. And, perhaps most importantly, affording statutory beneficiaries, such as plaintiffs, some participation in the Secretary's Title VI and Section 504 enforcement proceedings may help "generat[e] the feeling . . . that justice has been done."[35]

Nevertheless, since the nature and importance of the interests and the government action involved often affect the procedural requisites,[36] it is important to recognize the manner in which the interests implicated in this case differ from those in situations that have called for a formal trial-type hearing. To begin with, the general prohibitions declared in Title VI and Section 504 cannot be accurately described as conferring a legal "entitlement" in the same sense that the welfare recipient in *Goldberg v. Kelly, supra,* was "entitled" to basic sustenance under a system of categorical assistance. While Title VI and Section 504, like most remedial statutes, confer benefits upon broad classes of people, not all remedial statutes are designed to create "entitlements". Some statutes, welfare or veterans' benefit statutes, for example, confer

---

34. An "ultimate beneficiary" is not to be confused with a "recipient".

"The term 'recipient' means any State, political subdivision of any State, or instrumentality of any State or political subdivision, any public or private agency, institution or organization, or other entity, or any individual, in any state, to whom Federal financial assistance is extended, directly or through another recipient, for any program, . . . but such term does not include any ultimate beneficiary under any such program." 45 C.F.R. § 80.13(i).

The WMC is a "recipient" within this definition.

35. *Joint Anti-Fascist Refugee Committee v. McGrath, supra,* 341 U.S. at 172, 71 S.Ct. at 649 (Frankfurter, J., concurring).

36. *Compare Goldberg v. Kelly, supra, with In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). *See also Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Bowles v. Willingham,* 321 U.S. 503, 520–21, 64 S.Ct. 641, 88 L.Ed. 892 (1944).

direct aid upon identified classes of persons. *See, e. g., Goldberg v. Kelly, supra.* In the absence of expressed intent to the contrary, one can reasonably infer that Congress intended the direct beneficiaries under those statutes to have legally enforceable "entitlements" to the benefits so long as they remained eligible and satisfied certain objectively defined criteria. The interest ripens into an entitlement once the facts satisfy those criteria and the decision to grant the benefit is removed from agency discretion.[37] Granting an "entitlement", moreover, assures that each beneficiary receives the benefit that Congress intended to give him. Thus, linking due process protections to the vindication of the beneficiaries' right or "entitlement" promotes the overall congressional scheme.

On the other hand, statutes such as Title VI and Section 504 do not confer direct aid upon identified persons or beneficiaries. Instead, Congress enacted these statutes in order to bestow a benefit upon the ultimate beneficiaries of federal largesse through financial inducements, not to the beneficiaries, but to public or private recipients of federal aid to encourage compliance with the national anti-discrimination policy without resort to judicial process.[38] A comprehensive system of administrative enforcement was provided to effectuate the congressional scheme and to afford remedial redress for violations of the private interests secured by the statute. *See* 42 U.S.C. § 2000d–1. The benefits conferred by Title VI and Section 504 thus depend on both the persuasive influence of economic incentives for private and public recipients and administrative enforcement action. However, there is no aid extended directly to the beneficiaries of these laws that ripens into an enforceable entitlement when certain objective criteria are satisfied and, in this sense, their interests plainly differ from conventional interests which courts have classified as "entitlements". *See, e. g., Goldberg v. Kelly, supra*; Reich, *The New Property,* 73 Yale L.J. 733 (1964).

An additional factor to be considered is the nature of the risk of loss posed by government action under Title VI or Section 504. While administrative determinations may arguably deprive a beneficiary of his or her interests under Title VI or Section 504, the beneficiary's statutory right or

---

**37.** *Cf., e. g., Arnett v. Kennedy,* 416 U.S. 134, 181–182, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (White, J., concurring); *Cafeteria Workers v. McElroy, supra,* 367 U.S. at 896–98, 81 S.Ct. 1743.

**38.** Indeed, the Civil Rights Act of 1964 evidently was adopted in response to the perceived weakness of piecemeal civil rights enforcement litigation in federal courts.

"[I]n the last decade it has become increasingly clear that progress has been too slow and that national legislation is required to meet a national need which becomes ever more obvious. That need is evidenced, on the one hand, by a growing impatience by the victims of discrimination with its continuance and, on the other hand, by a growing recognition on the part of all of our people of the incompatibility of such discrimination with our ideals and the principles to which this country is dedicated. . . . H.R. 7152 [ultimately, the Civil Rights Act of 1964], as amended, . . . is designed as a step toward eradicating significant areas of discrimination on a nationwide basis." H.R. Rep. No. 914, 88th Cong., 1st Sess. (1963) *reprinted in* 1964 U.S.Code Cong. & Admin. News pp. 2391, 2393.

Title VI, in particular, was deemed necessary to rescue school desegregation from the bog in which it had been mired for ten years. Perhaps better able than any other authority to comprehend the significance of the 1964 Civil Rights Act, the Civil Rights Commission said this about Title VI:

"This statute heralded a new era in school desegregation . . . .. Most significantly . . . Federal power was to be brought to bear in a manner which promised speedier and more substantial desegregation than had been achieved through the voluntary efforts of school boards and district-by-district litigation. . . . With [federal] funds of such [great] magnitude at stake, most school systems would be placed at a serious disadvantage by termination of Federal assistance." Report of the U.S. Commission on Civil Rights, Survey of School Desegregation in the Southern and Border States—1965–66 at 2, *quoted in United States v. Jefferson County Bd. of Education,* 372 F.2d 836, 856 (C.A.5, 1966), *aff'd in banc as modified,* 380 F.2d 385, *cert. denied* 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

"entitlement" to direct aid under federal health assistance programs is not affected. In the proceedings under review here, for example, no party has alleged, or even suggested, that the Secretary's decision to approve Plan Omega has deprived eligible recipients of their right to receive assistance under medicare,[39] medicaid[40] or maternal and child health programs.[41] Although implementation of Plan Omega arguably might cause certain medical services to be less accessible for some segments of the urban and the suburban population, including the plaintiffs, there is no indication that the proposed relocation will in effect place hospital services entirely out of the reach of urban minorities, handicapped or indigent persons.[42] Insofar as the Secretary's decision may affect the accessibility of medical services, his action poses a less serious threat to plaintiffs' interest than, for example, a governmental decision to terminate welfare payments to Kelly in *Goldberg v. Kelly, supra,* which deprived him of the means of existence, or the revocation of Morrissey's parole in *Morrissey v. Brewer, supra,* which deprived him of his liberty, or the denial of a security clearance to Greene in *Greene v. McElroy,* 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), which meant the loss of his employment.

B. *The Risk Of A Mistaken Deprivation.*

The second factor to be weighed under the balancing approach of *Mathews v. Eldridge, supra,* the risk of an erroneous de-

termination through the procedures used, is a short hand reference to the rational aspects of a decisionmaking process. In attempting to evaluate the risk of error inherent in the Title VI and Section 504 enforcement procedures, it is important first to ascertain the nature of the determinations made by the Secretary. *See Mitchell v. W. T. Grant Co.,* 416 U.S. 600, 617, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); Friendly, *Some Kind of Hearing,* 123 U.Pa.L.Rev. 1267, 1281 (1975).

■ In this case, plaintiffs' complaint against WMC prompted an extensive investigation of Plan Omega to determine the possible effects of the proposed relocation on the handicapped and other minority members of the urban community. The investigation developed general findings regarding the racial configuration, by service category, of WMC's present patient admissions, the geographic concentration of minorities in relation to the present and proposed site for WMC's hospital facilities, the existing and proposed public and private transit services and their effect on the problem of accessibility to the proposed hospital site, and the possible impact of the relocation on needed physical improvements to WMC's existing facilities and the concomitant enhancement of sophisticated tertiary medical services offered by WMC.[43] Thereafter, HEW policymakers analyzed and evaluated the general findings in order to (1) determine, through extrapolation,

**39.** 42 U.S.C. § 1395.

**40.** 42 U.S.C. § 1396.

**41.** 42 U.S.C. §§ 701 *et seq.* Actually, if the Secretary and WMC had been unable to achieve voluntary compliance and federal funds to WMC had been subsequently terminated, plaintiffs could plausibly contend that they had been cut off from medicare or medicaid assistance for which they are eligible without being afforded a hearing. *Cf. Goldberg v. Kelly, supra.*

**42.** This factor distinguishes *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974). There the Supreme Court held that an Arizona statute requiring a year's residence in a county as a condition to an indigent's receiving nonemer-

gency hospitalization or medical care at county expense violated the Equal Protection Clause of the Fourteenth Amendment. Justice Marshall's reference in the majority opinion to medical care as "a basic necessity of life" was clearly made in the context of government action which resulted in an absolute denial of medical care for certain members of society. *Id.,* 415 U.S. at 259–60, 94 S.Ct. 1076. There is no indication in this case, however, that plaintiffs, or any member of the class they represent, will be denied the right to medical care as a consequence of the Secretary's approval of a modified Plan Omega.

**43.** *See NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, at 311–328 (D.Del. April 7, 1978).

whether Plan Omega would, if implemented, unlawfully discriminate against plaintiffs or other members of the urban minority population and (2) decide upon the type of conditions or assurances WMC would be required to effectuate in connection with Plan Omega so as to eliminate or mitigate the discriminatory effect, if any, which might develop. From this it is clear that the Secretary's decisionmaking process was concerned with the *prediction of future effects* or consequences and did not focus exclusively on non-recurring past events. To the extent that his inquiry was directed towards the ascertainment of general statistical facts—what is the current racial profile of patient admissions to WMC's existing facilities? what transit services are provided by WMC?—they are technical facts about the *recipient*. It seems unlikely, therefore, that plaintiffs, or complainants in general, would have any special familiarity with these facts or that the elaborate procedural safeguards which plaintiffs demand would, in the general run of cases, serve to elicit essential information not already available to the Secretary through the submission of relevant data and written argument either supporting or opposing the complaint. Nevertheless, the plaintiffs seek to encumber the Secretary's discretionary authority to secure voluntary compliance with a formal hearing, the right to cross-examine adverse witnesses, and an impartial decisionmaker who must state the reasons for his decision and the evidence on which he relies. These procedural safeguards, however, are characteristic of an "adjudicatory" proceeding, where the outcome turns on accurate resolution of specific factual disputes pertaining to particular individuals. When an administrative agency is about to take action adverse to a citizen on the basis of "adjudicative facts,"[44] due process entitles the citizen at some stage to have notice, to be informed of the facts on which the agency relies, and to have an opportunity to rebut them, *London-*

*er v. Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908); *Goldberg v. Kelly, supra,* unless the circumstances indicate the citizen has waived such rights or he is unable to make a required preliminary showing of grounds that would warrant a hearing. *See Boddie v. Connecticut,* 401 U.S. 371, 378–79, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Pfizer, Inc. v. Richardson,* 434 F.2d 536, 542–43 (C.A.2, 1970). But we think the nature of the Secretary's investigation with respect to Plan Omega can reasonably be considered quasi-legislative in character since he relied on "general facts which help[ed] [him] decide questions of law and policy and discretion." 1 K. Davis, *Administrative Law Treatise,* § 7.02 at 413 (1958). None of the elaborate procedural safeguards sought by plaintiffs, therefore, would seem to be very relevant or effective in attempting to demonstrate to the Secretary that a particular site location for a proposed hospital facility will create disparities in the quality and availability of health care for urban minorities or in persuading the Secretary of the inadequacy of remedial conditions imposed by him on the recipient as a means of ensuring its compliance with the civil rights laws.

Unquestionably, as the plaintiffs point out, the Secretary's decision may dramatically affect an individual or a family in the area which is served by WMC's existing hospital system. But the Court does not understand how this aspect of the Secretary's action could be construed to authorize adjudicatory hearings on the issue whether a proposed hospital relocation would contravene Title VI and Section 504. It certainly does not change the nature of the fact finding determinations to be made in this regard by the Secretary. These determinations remain legislative in character and thus do not necessitate adjudicatory procedures, 1 K. Davis, *Administrative Law Treatise,* supra § 7.02, at least so long as there exists "some adequate institutional means for marshaling the appropriate legis-

44. "Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the question of who did what, where, when, how, why, with what motive or intent; [they] are roughly the kind of facts that go to a jury in a jury case." 1 K. Davis, *Administrative Law Treatise,* § 7.02 at 413 (1958).

lative facts . . . ." *Shannon v. HUD,* 436 F.2d 809, 821 (C.A.3, 1970).

It follows from this that the Court cannot accept plaintiffs' contention that they come within the protection of cases such as *Goldberg v. Kelly, supra* and *Mattern v. Weinberger, supra.* Those cases involved a decisionmaking process that required individual determinations, the singling out of a particular person in light of circumstances uniquely applicable to him. In that context, the value of a trial-type hearing is manifest—issues of credibility and veracity are involved, requiring flexibility in presentation and the opportunity for the individual to portray the facts in the fashion most favorable to him and to "mold his argument to the issues the decision maker appears to regard as important." *Goldberg v. Kelly, supra,* 397 U.S. at 269, 90 S.Ct. at 1021; *see* L. Tribe, *American Constitutional Law* § 10–12 at 539 ("the due process requirement of an adversary hearing is triggered . . . by a governmental decision to single out particular persons for deprivation").

By contrast, the Secretary's inquiry under review here addressed a host of complicated, and frequently value-laden, issues and sub-issues regarding the *future* effect of a private hospital's proposed site relocation on minority and handicapped persons residing within the City of Wilmington. The investigation was not designed to determine the consequences of that relocation for any single person or family, but focused instead on its consequences for the entire class of putative beneficiaries under Title VI and Section 504. *Cf. Gart v. Cole,* 263 F.2d 244 (C.A.2), *cert. denied,* 359 U.S. 978, 79 S.Ct. 898, 3 L.Ed.2d 929 (1959); *Powelton Civic Home Owners Ass'n v. HUD,* 284 F.Supp. 809 (E.D.Pa.1968). Thus, the effect of WMC's relocation project on urban minorities, and the selection of an appropriate remedy for the unlawful effect, if any, that might develop as a result of the project, were determinations that rested on the agency's expert evaluation of the above-mentioned general findings. Again, however, those generalized findings were based largely on technical information, *viz.,* demographic statistics, transportation surveys, patient admissions data, racial and socio-economic information, which clearly would not implicate issues of witness credibility or veracity necessitating an oral hearing. Indeed, information of this nature is more amenable to written than to oral submissions and, therefore, the "value of an evidentiary hearing, or even a limited oral presentation, to an accurate presentation of those factors to the decisionmaker does not appear substantial." *Mathews v. Eldridge, supra,* 424 U.S. at 344 n. 28, 96 S.Ct. at 907. In the generality of cases, moreover, it seems doubtful that information of such a technical nature would be proffered by a complainant. To be sure, a complaint often is a good source of information for a regional office on local compliance issues concerning particular practices of a recipient. But information relevant to larger and more complex issues involving technical, statistical data, or information pertinent to issues that depend on uncertain future events and requiring probabilistic evaluations by experts, will not likely be contributed by individual complainants.

Given the nature of the Secretary's inquiry, the Court is satisfied that the procedures under review here adequately ensure the acquisition of accurate information necessary to make an informed decision. The plaintiffs, and for that matter all persons who deem themselves aggrieved, are authorized to file, as of right, a complaint which automatically triggers an investigation of the allegedly offending recipient by the experienced staff of HEW.[45] Plaintiffs were afforded an opportunity to, and did in fact, submit data and written argument in support of the complaint;[46] they also were

---

45. *See NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, 307–308 & n. 91 (D.Del. April 7, 1978).

46. It also bears mentioning that the plaintiffs in this action were able to secure legal representa-

tion and therefore could delineate more precisely the legal basis for their complaint. Thus, there is no room for argument that written submissions were an inadequate substitute for oral presentation because they did not provide an effective means for plaintiffs to communi-

permitted to participate in the Secretary's six month review of Plan Omega and were informed of his initial finding of noncompliance together with the reasons supporting that finding. Thereafter when the Secretary sought to bring Plan Omega into compliance through informal, voluntary negotiation, a procedure explicitly mandated by Congress, the plaintiffs were afforded the opportunity, which they accepted, to attend conferences between officials of HEW and representatives of the recipient (WMC). While the Secretary was in the process of formulating an appropriate remedy designed to bring Plan Omega into compliance, plaintiffs again submitted their views, both orally and in writing, in support of particular remedial measures which they considered essential for the protection of their interests.[47] In fact, after the Secretary had tentatively settled upon the nature and scope of the necessary assurances concerning the project, legal representatives of plaintiffs were advised of his determination and afforded an opportunity to offer a final round of oral and written objections.

The Court is satisfied that these procedures enabled the plaintiffs to fairly present their arguments and supporting information to the Secretary; they also permitted plaintiffs to develop new arguments and to submit new evidence in response to the precise legal issues which the Secretary regarded as crucial. The Secretary's procedures thus appear reasonably calculated to obtain accurate information necessary to make an informed decision.

■ Finally, we think the risk of error was further diminished, and the rights of plaintiffs adequately protected, by the opportunity to obtain judicial review pursuant to the Administrative Procedure Act ("APA") of the Secretary's decision. *See Shannon v. HUD, supra,* 436 F.2d at 821. Under the APA, of course, federal courts are empowered to review an administrative record to ensure that the agency stayed within its statutory authority, observed all procedural regularities, and acted neither arbitrarily nor capriciously. 5 U.S.C. § 706(2)(A)–(D); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–17, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

The plaintiffs, in fact, challenged the Secretary's decision in this Court pursuant to the APA on the ground that his findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Since the issues were admittedly difficult ones and the information relied on by the Secretary technical in nature, judicial review under the arbitrary and capricious standard necessitated a searching and intensive examination of the administrative record. Upon completion of its review, the Court was satisfied that the agency record furnished both an adequate explanation and rational support for the Secretary's decision and, therefore, his decision was affirmed. *NAACP v. Wilmington Medical Center, Inc.,* 453 F.Supp. 280, (D.Del. April 7, 1978).

Plaintiffs respond to this by arguing that since the scope of judicial review was confined to the arbitrary and capricious standard under the APA they were entitled to a trial-type hearing at the agency level; they rely extensively on Judge J. Skelly Wright's opinion in *National Welfare Rights Organization ("NWRO") v. Finch,* 429 F.2d 725 (C.A.D.C.1970), to buttress their theory. In that case, the Secretary of HEW had convened hearings to determine whether the welfare laws of the states of Nevada and Connecticut were in conformity with certain federal standards in the Social Security Act so that these states might continue to receive payments of federal aid for their welfare assistance programs. Plaintiff NWRO, a national voluntary association of welfare recipients, sought an injunction di-

---

cate their case to the decisionmaker. *Compare Mathews v. Eldridge, supra, and Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) *with Goldberg v. Kelly, supra.*

47. *See* nn. 18 & 19 and accompanying text *supra.*

recting the Secretary to permit them to participate as parties in the hearings. Although injunctive relief was denied at the district court level, the District of Columbia Circuit Court of Appeals reversed and held that the NWRO had standing to intervene in an HEW conformity hearing,[48] a holding reached by analogy to the law of standing to seek judicial review. *Id.* 429 F.2d at 732–35. The Court's opinion, however, was clearly predicated on the fact that neither welfare recipients individually nor organizations representative of their interests were permitted to participate in the Secretary's conformity hearings in order to protect the rights of welfare recipients generally. Although the Secretary's determination at the conclusion of the hearing was judicially reviewable under the APA, the Court concluded that effective and meaningful judicial review at least required that welfare recipients be afforded the right to "participat[e] in the proceeding to be reviewed." *NWRO v. Finch, supra,* 429 F.2d at 736.

Unlike the welfare recipients in *NWRO*, plaintiffs here were afforded ample participation rights and, as a result, contributed significantly to the administrative proceedings that eventually were subjected to review in this Court. By no stretch of the imagination can it be said that plaintiffs' right to judicial review in this case was hamstrung because of inadequate or ineffective rights to participate in the Secretary's review and settlement of the charges against WMC and Plan Omega and, therefore, their reliance on *NWRO* is to no avail.

Even though the circumstances in *NWRO* are distinguishable from those here, it is nevertheless interesting to note that the District of Columbia Circuit, while finding that welfare recipients may intervene in a conformity hearing called by the Secretary, carefully restricted its holding with the following language:

"We do not hold that this intervenor status creates in [welfare recipients] a right

to participate in any way in the Secretary's informal efforts, before or after the calling of a hearing, to bring a state into conformity, nor do we limit his right to terminate a hearing, once called or begun, upon a determination by him that it is no longer necessary because he believes that conformity has been achieved. In such event, [welfare recipients] are free to question that determination either indirectly by proceeding against the state, . . . or directly against the Secretary by a suit asserting that he is acting beyond, or in conflict with, his statutory authority . . . ." 429 F.2d at 739 (citations omitted).

This observation reinforces the Court's decision herein that the procedures employed by HEW, in conjunction with the right to judicial review, adequately protected plaintiffs' rights under Title VI and Section 504.

In a similar vein, the parties have directed the Court's attention to the recent decision by Judge Weinstein in *Caulfield v. Board of Education of the City of New York,* 449 F.Supp. 1203 (E.D.N.Y.1978). There, plaintiff school teachers, supervisors and administrators challenged on due process grounds on agreement between HEW and the New York City Board of Education that required the assignment of teachers to various schools on the basis of race in order to bring the school districts into compliance with Title VI. Judge Weinstein held that HEW had not properly complied with procedures required by Title VI and remanded the matter so that individuals directly affected by the teacher assignment agreement could participate in the decisionmaking process that produced the agreement. *Id.* at 1206, 1227.

In stark contrast to the circumstances here, however, Judge Weinstein found that HEW's enforcement proceedings against the recipient, the New York City Board of Education, had advanced to the administrative hearing phase and were no longer amenable to informal methods of resolution

---

**48.** *NWRO v. Finch* was decided prior to the promulgation of the HEW regulations specifically authorizing intervention in conformity

hearings. 45 C.F.R. § 213.15. Those regulations were promulgated in response to the *NWRO* case.

through "voluntary" compliance. *Id.* at 1220–1221. Moreover, the plaintiff teachers in the *Caulfield* case who were directly affected by the teacher assignment agreement were not permitted to participate in the administrative hearing or to otherwise submit their views regarding the substance of the assignment agreement. *Id.* at 1211–1213. These factors, together with the fact that Judge Weinstein did not base his holding on the constitutional claim involved, render *Caulfield* inapposite.

## C. *The Public Interest.*

The final factor to be measured in arriving at an appropriate due process balance is the government or public interest. This inquiry focuses on the efficacy of the procedures under review and on the time, effort and expense of elaborate, alternative procedures. *See Mathews v. Eldridge, supra,* 424 U.S. at 347–49, 96 S.Ct. 893; L. Tribe, *American Constitutional Law* § 10–13 at 540–43.

The government's interest in this case is substantial. To require an evidentiary hearing upon demand every time a complainant is dissatisfied with the Secretary's decision to informally settle a complaint through voluntary compliance methods would impose an overwhelming burden on the agency. In this case alone, for example, there are literally thousands of persons affected by the Secretary's action, and each may have a slightly different view of the wisdom of his action. Since every person who deems himself aggrieved thereby is entitled to file a complaint, and under plaintiffs' theory demand an evidentiary hearing on its merits, the agency's resources would be largely, if not completely, expended in conducting such time-consuming and expensive hearings.

Furthermore, as we have seen, the judicial-type procedures advocated by plaintiffs would not, in light of the nature of the decision to be made, serve as an efficient instrument for the acquisition of accurate and relevant information necessary for an informed decision. The procedures presently under review, on the other hand, provide complainants with an effective process for asserting their claims and supporting them with whatever information or argument they deem relevant prior to administrative action; and, of course, their right to judicial review of the final disposition of their claims adequately protects their interests against arbitrary administrative deprivation.

Finally, the judicial model that plaintiffs seek to impose on the administrative setting at issue here could effectively undermine other important objectives which the legislature sought to advance when it adopted the Civil Rights Act of 1964. Congress clearly believed that the emphasis on voluntary compliance in Title VI would encourage recipients of federal assistance and government agencies to engage in informal, flexible efforts to swiftly and amicably eradicate significant areas of discrimination. The "judicialization" of this process, however, would end the flexibility of the Secretary's procedures, and, in all likelihood, would defeat the voluntary compliance philosophy of Title VI and Section 504. Recipients would have little incentive to engage in serious voluntary compliance discussions with HEW officials if they knew that adversary hearings challenging the validity or adequacy of proposed compliance measures were sure to follow.

The Court concludes, therefore, that the failure to accord plaintiffs, as complainants under the regulations implementing Title VI and Section 504, a trial-type hearing with respect to their dissatisfaction with the Secretary's voluntary settlement of their complaint did not offend the due process requirements of the Fifth Amendment.

## IV. THE EQUAL PROTECTION CLAIM.

The distinction drawn in the regulations between the hearing rights accorded to recipients and to complainants also sparked plaintiffs' alternate equal protection argument. Leaving to one side their standard due process objections, plaintiffs contend that they are denied equal protection of the law in that recipients may request a full-

dress hearing if voluntary compliance negotiations break down, while on the other hand complainants are not provided any sort of hearing if efforts to achieve voluntary compliance prove successful and they are disenchanted with the results. This unequal treatment, it is argued, is arbitrary and irrational. *See, e. g., City of New Orleans v. Dukes,* 427 U.S. 297, 304–06, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).

■ "Strict scrutiny" is not appropriate since the separate classification of complainants and recipients is certainly not "drawn upon inherently suspect distinctions such as race, religion or alienage," *New Orleans v. Dukes, supra,* 427 U.S. at 303, 96 S.Ct. at 2516; *see Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 313–14, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), and the classification does not appear to interfere with any discernible fundamental right in the constitutional sense. *E. g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (right of a uniquely private nature); *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (right to vote); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (right of interstate travel); *Williams v. Rhodes,* 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (rights guaranteed by the First Amendment); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (right to procreate).

■ Under the Supreme Court's prevailing formulation the validity of the distinction between recipients and complainants is to be examined under the "rational basis" standard—whether it is rationally related both to a legitimate governmental interest and to the objective of the particular legislation. *Ohio Bureau of Employment Services v. Hodory,* 431 U.S. 471, 489–91, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *New Orleans v. Dukes, supra* ; *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 813–14, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). In the Court's view, the distinction in the nature of the procedural protections afforded to complainants and to recipients cannot be held irrational or arbitrary. The purpose of both Title VI and Section 504 is to eliminate the financial participation of the federal government in illegal discrimination. *See* 110 Cong.Rec. 7062 (1964) (remarks of Senator Pastore). *See also Mayor & City Council of Baltimore v. Mathews,* 562 F.2d 914, 923 (C.A.4, 1977) (en banc); *Board of Public Instruction of Taylor County, Florida v. Finch,* 414 F.2d 1068, 1075 (C.A.5, 1969). To that end, federal agencies empowered to extend financial assistance to programs or activities are directed to end all such assistance to recipients found to have engaged in illegal discrimination. Granting a hearing to an offending recipient prior to terminating potentially massive sums of money, however, would not logically compel the grant of a hearing to complainants who trigger and participate in the investigative review of the recipient's practices. The recipient benefits directly from federal largesse and the adverse consequences likely to flow from its termination are self-evident. The complainant's interest depends upon the enforcement of federal standards; so long as the appropriate agency carries out its statutory responsibilities to ensure that federal monies do not support illegal discrimination, the complainants' interests are sufficiently protected. The provision of dissimilar procedural safeguards for complainants and recipients thus rests on the clear difference in interest created under Title VI and Section 504, the nature of the loss caused by government action, and Congress' explicit direction that recipients threatened with a fund cut-off be afforded an adversary hearing. *See* 42 U.S.C. § 2000d–1. Plaintiffs' equal protection argument is accordingly without merit.

An order consistent with this opinion will be entered by the Court.